No. 21-10539-DD

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

### DRAVION WARE,

*Defendant-Appellant.*

On appeal from the United States District Court
for the Northern District of Georgia
No. 1:17-CR-00447-TCB-JSA-2

## BRIEF OF APPELLEE
## THE UNITED STATES OF AMERICA

KURT R. ERSKINE
*United States Attorney*

BRET R. HOBSON
*Assistant United States Attorney*

600 United States Courthouse
75 Ted Turner Drive S.W.
Atlanta, GA 30303
(404) 581-6000

No. 21-10539-DD

*United States of America v. Dravion Ware*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The United States agrees that the Certificate of Interested Persons and Corporate Disclosure Statement included with Appellant's brief is a complete list of all people and entities known to have an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The issues and positions of the parties, as presented in the record and briefs, are sufficient to enable the Court to reach a just determination.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
    Statement ........................................................................ C-1

Statement Regarding Oral Argument .............................................. i

Table of Contents ............................................................................ ii

Table of Citations ............................................................................ v

Statement of Jurisdiction ................................................................ x

Statement of the Issues ................................................................... 1

Statement of the Case ..................................................................... 3

    A. Course of Proceedings and Disposition Below ................... 3

    B. Statement of the Facts ......................................................... 4

        1. Pretrial Motions ............................................................ 4

            a. The Fingerprint Motion ........................................ 4

            b. The Lay Opinion Identification Motion ................... 6

        2. Trial ............................................................................... 7

            a. First Robbery (alleged only in the conspiracy count)
               – October 7, 2017, at Spring Spa .............................. 7

            b. Second Robbery (alleged in the conspiracy count and
               in Counts 2 and 3) – October 10, 2017, at Cedar
               Massage ...................................................................... 8

            c. Third Robbery (alleged in the conspiracy count and
               in Counts 4 and 5) – October 13, 2017,
               at Qi Clay Sauna ....................................................... 9

            d. Fourth Robbery (alleged only in the conspiracy count)
               – October 20, 2017, at Lush Nails and Spa ............. 11

e.  Fifth Robbery (alleged in the conspiracy count and in Counts 6 and 7) – October 24, 2017, at Kochi Maru ........................................................ 12

f.  Sixth Robbery (alleged only in the conspiracy count) – November 3, 2017, at Royal Massage.................... 14

g.  Seventh Robbery (alleged in the conspiracy count and in Counts 8 and 9) – November 8, 2017, at Empress Massage II ................................................ 15

h.  Eighth Robbery (alleged only in the conspiracy count) – November 8, 2017, at BD Spa and Wellness Massage .................................................... 16

i.  Ninth Robbery (alleged in the conspiracy count and in Counts 10 and 11) – November 10, 2017, at New You Massage ............................................... 17

j.  The Arrests of Smith and Ware................................ 20

k.  Lay Opinion Identification Testimony.................... 23

3.  Jury Charges and Verdict .............................................. 24

4.  Sentencing.................................................................... 25

C. Standard of Review ............................................................ 27

Summary of the Argument................................................................ 29

Argument and Citations of Authority ............................................ 31

1.  The District Court Did Not Abuse Its Discretion by Admitting Expert Testimony Regarding Latent Fingerprint Analysis Without First Holding a *Daubert* Hearing................................ 31

2.  The District Court Did Not Abuse Its Discretion by Admitting Lay Opinion Identification Testimony from FBI Agents that Spent Time with Ware Shortly After the Robberies................ 38

3.  The District Court Did Not Abuse Its Discretion by Instructing the Jury on Evidence of Flight. ................................. 45

iii

4.  The District Court Did Not Err by Concluding that Victims Were Physically Restrained to Facilitate the Robberies at Lush Nails, Royal Massage, and BD Spa and Wellness Massage...... 53

Conclusion........................................................................ 58

Certificate of Compliance and Service ......................................... 59

# TABLE OF CITATIONS

**Federal Cases**

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.,*
    402 F.3d 1092 (11th Cir. 2005)......................................................... 33

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ................................................................. 33, 34

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ....................................................................... 33

*\*United States v. Abreu,*
    406 F.3d 1304 (11th Cir. 2005) ..........................................32, 33, 35

*United States v. Ballard,*
    423 F.2d 127 (5th Cir. 1970)........................................................... 46

*\*United States v. Barton,*
    909 F.3d 1323 (11th Cir. 2018) ..................................................... 37

*United States v. Beck,*
    418 F.3d 1008 (9th Cir. 2005)......................................................... 41

*United States v. Bell,*
    947 F.3d 49 (3d Cir. 2020) ....................................................... 56, 57

*United States v. Bonds,*
    No. 15 CR 573-2, 2017 WL 4511061 (N.D. Ill. Oct. 10, 2017),
    *aff'd,* 922 F.3d 343 (7th Cir. 2019)................................................. 35

*\*United States v. Borders,*
    693 F.2d 1318 (11th Cir. 1982) ................................................46, 51

*United States v. Brannon,*
    616 F.2d 413 (9th Cir. 1980)........................................................... 41

*United States v. Calhoun,*
    544 F.2d 291 (6th Cir. 1976)........................................................... 42

\*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Contreras,*
536 F.3d 1167 (10th Cir. 2008).......................................................... 41

*United States v. Crisp,*
324 F.3d 261 (4th Cir. 2003).............................................................. 34

*United States v. Drury,*
396 F.3d 1303 (11th Cir. 2005)..................................................... 36, 37

*United Sates v. Farnsworth,*
729 F.2d 1158 (8th Cir. 1984).......................................................... 40

*United States v. Fulton,*
837 F.3d 281 (3d Cir. 2016) ....................................................... 41, 42

*United States v. Hands,*
184 F.3d 1322 (11th Cir. 1999)........................................................ 44

*United States v. Hansen,*
262 F.3d 1217 (11th Cir. 2001)........................................................ 27

*United States v. Hawkins,*
905 F.2d 1489 (11th Cir. 1990)........................................................ 36

*United States v. Hawkins,*
934 F.3d 1251 (11th Cir. 2019)............................................. 43, 44, 53

*United States v. Hood,*
846 F. App'x 825 (11th Cir. 2021)................................................... 35

*United States v. House,*
684 F.3d 1173 (11th Cir. 2012)........................................................ 49

*United States v. Jadlowe,*
628 F.3d 1 (1st Cir. 2010)............................................................... 41

*United States v. John,*
597 F.3d 263 (5th Cir. 2010).......................................................... 34

*United States v. Jones,*
32 F.3d 1512 (11th Cir. 1994) .................................................. 54, 55

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Knowles*,
  889 F.3d 1251 (11th Cir. 2018)................................................. 27, 44

*United States v. Martinez*,
  190 F.3d 673 (5th Cir. 1999)......................................................... 47

*United States v. Maxi*,
  886 F.3d 1318 (11th Cir. 2018)..................................................... 46

*United States v. Meester*,
  762 F.2d 867 (11th Cir. 1985)....................................................... 52

*United States v. Mitchell*,
  365 F.3d 215 (3d Cir. 2004) .......................................................... 34

*United States v. Myers*,
  550 F.2d 1036 (5th Cir. 1977).................................................. 46, 47

*United States v. Pena*,
  586 F.3d 105 (1st Cir. 2009) ......................................................... 34

*United States v. Pena*,
  684 F.3d 1137 (11th Cir. 2012)................................................ 52, 53

*United States v. Pierce*,
  136 F.3d 770 (11th Cir. 1998) ...........................................27, 39, 40

*United States v. Pitts*,
  No. 16-CR-550, 2018 WL 1116550 (E.D.N.Y. Feb. 26, 2018) ...... 35

*United States v. Solomon*,
  856 F.2d 1572 (11th Cir. 1988)..................................................... 52

*United States v. Stewart*,
  579 F.2d 356 (5th Cir. 1978)......................................................... 51

*United States v. Victor*,
  719 F.3d 1288 (11th Cir. 2013) ...........................................28, 54, 55

*United States v. Whatley*,
  719 F.3d 1206 (11th Cir. 2013)..................................................... 54

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

*United States v. Williams,*

    541 F.3d (11th Cir. 2008)...................................................28, 49, 51

*Van Buren v. United States,*

    151 S. Ct. 1648 (2021) ................................................................ 34

**Federal Statutes**

18 U.S.C. § 922(g)(1)....................................................................... 3

18 U.S.C. § 924(c) ......................................................................... 27

18 U.S.C. § 924(c)(1)(A)(ii) ............................................................ 3

18 U.S.C. § 924(c)(1)(A)(iii) ........................................................... 3

18 U.S.C. § 1951(a) ........................................................................ 3

18 U.S.C. § 3231 ............................................................................. x

18 U.S.C. § 3742 ............................................................................. x

28 U.S.C. § 1291 ............................................................................. x

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A) .............................................................. x

Fed. R. App. P. 32(a)(5) ................................................................ 59

Fed. R. App. P. 32(a)(6) ................................................................ 59

Fed. R. App. P. 32(a)(7)(B) ........................................................... 59

Fed. R. App. P. 32(f) ..................................................................... 59

Fed. R. Crim. P. 30(d) ................................................................... 52

Fed. R. Crim. P. 52(b) ................................................................... 52

Fed. R. Evid. ................................................................................. 32

Fed. R. Evid. 701 ..................................................................... 39, 44

Fed. R. Evid. 702 .......................................................................... 39

**Sentencing Guidelines**

U.S.S.G. § 1B1.1, cmt.1(K) .......................................................... 54

U.S.S.G. § 2A2.1 ........................................................................... 25

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

U.S.S.G. § 2B3.1...................................................................... 25

U.S.S.G. § 2B3.1, n.5 ............................................................. 25

U.S.S.G. § 2B3.1(b)(2).......................................................... 25

U.S.S.G. § 2B3.1(b)(3).......................................................... 25

U.S.S.G. § 2B3.1(b)(4)(b) ..................................................... 25

U.S.S.G. § 2B3.1(b)(4)(B)..........................................26, 53, 56

U.S.S.G. § 3B3.1, cmt.1 ....................................................... 54

**Other Authorities**

*The First Criminal Trial That Used Fingerprints as Evidence*,
Smithsonian Magazine (Dec. 5, 2018),
  https://www.smithsonianmag.com/history/first-case-where-
  fingerprints-were-used-evidence-180970883/
  (last visited Mar. 31, 2022) ............................................. 31

Nat'l Research Council, *Strengthening Forensic Science in the United
States: A Path Forward (2009) (NRC Report)*,
  https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf
  (last visited Mar. 31, 2022 ............................................ 4, 5

*President's Council of Advisors on Sci. & Tech., *Report to the President,
Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-
Comparison Methods (2016) (PCAST Report)*,
  https://obamawhitehouse.archives.gov/sites/default/files/
  microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf
  (last visited Mar. 31, 2022)...............................................5

PCAST, *An Addendum to the PCAST Report on Forensic Science in
Criminal Courts 2*,
  https://obamawhitehouse.archives.gov/sites/default/files/
  microsites/ostp/PCAST/pcast_forensics_addendum_finalv2.pdf
  (last visited Mar. 31, 2022)...................................... 32, 33

*Citations primarily relied upon. 11th Cir. R. 28-1(e).

No. 21-10539-DD

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DRAVION WARE,

*Defendant-Appellant.*

## STATEMENT OF JURISDICTION

(A) The district court had subject matter jurisdiction over the underlying criminal case based on 18 U.S.C. § 3231.

(B) The court of appeals has jurisdiction over this direct appeal from the judgment and sentence of the district court, under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

(C) While not jurisdictional, the notice of appeal was timely filed on February 16, 2021, within 14 days of the entry of the district court's judgment and commitment order, on February 10, 2021. Fed. R. App. P. 4(b)(1)(A).

(D) This appeal is from a final judgment and commitment order that disposes of all the parties' claims in this criminal case.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion when it refused to hold a *Daubert* hearing in response to Ware's unsupported assertion that all fingerprint expert testimony is unreliable; and whether any error in admitting the expert testimony was harmless.

2. Whether the district court abused its discretion by allowing case agents to offer lay opinion testimony that Ware appeared to be one of the robbers shown in surveillance footage and in "selfies" on his cell phone when the agents had spent significant time with Ware shortly after the robberies and nearly two years had passed before the trial, by which time Ware had changed his appearance; and whether any error in admitting the testimony was harmless.

3. Whether the district court abused its discretion by instructing the jury on evidence of flight or concealment when Ware, who knew the FBI was after him and had searched the Internet for ways to avoid detection, hid under his bed from agents that came to arrest him; and whether any error in giving the jury instruction was harmless.

1

4. Whether the district court properly applied a sentencing enhancement for physical restraint during three robberies when evidence showed the robbers prevented victims from leaving the businesses by brandishing firearms and pointing them at victims' heads, by putting an arm around one victim's neck from behind, by pushing a victim behind a store's counter, by forcing several victims to the floor, and by forcing several victims to the backs of the businesses being robbed.

## STATEMENT OF THE CASE

**A. Course of Proceedings and Disposition Below**

On July 16, 2019, the grand jury returned a third superseding indictment that charged Ware and his co-defendant, Tabyron Smith, with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); five counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts Two, Four, Six, Eight, and Ten); three counts of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Three, Nine, and Eleven); and two counts of discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Counts Five and Seven). (Doc. 173.) The indictment further charged Ware with two counts of possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts Twelve and Fourteen); and charged Smith with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Thirteen). (*Id.*)

On July 29, 2019, Ware proceeded to trial on Counts One through Eleven, and after five days of proceedings, the jury returned a guilty verdict as to all counts.[1] (Docs. 198, 200, 203, 205, 206, 209.)

---

[1] Counts Twelve and Fourteen would have been tried after the other counts in a bifurcated proceeding. (*See* Docs. 153, 157.) But

3

On February 10, 2021, the district court sentenced Ware to a total sentence of life in prison. (Doc. 279.) Ware filed a timely notice of appeal. (Doc. 280.) He is incarcerated.

### B. Statement of the Facts

#### 1. Pretrial Motions

Ware filed several pretrial motions, two of which are relevant to this appeal: one seeking to preclude any expert testimony regarding fingerprint comparisons and another seeking to preclude any lay opinion identification testimony by law enforcement agents:

#### a. The Fingerprint Motion

Ware filed a one-paragraph motion that sought to adopt his co-defendant's motion to preclude all fingerprint evidence. (Doc. 138.) Notably, the co-defendant's motion, which was scarcely longer than Ware's motion to adopt it, had not challenged the qualifications of the Government's fingerprint expert. (*See* Doc. 75.) Instead, the co-defendant's motion asked the district court to hold a *Daubert* hearing about the discipline of fingerprint analysis writ large. (*Id.* at 2.) The co-defendant based this request solely on his assertion that two government studies had questioned the reliability of fingerprint analysis. (*Id.* (citing Nat'l Research Council, *Strengthening Forensic*

_____

the Government dismissed these two counts after the jury convicted Ware on the first eleven counts in the indictment.  (Doc. 298 at 670.)

*Science in the United States: A Path Forward* (2009) (the "NRC Report"),[2] and President's Council of Advisors on Sci. & Tech., *Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) (the "PCAST Report")[3]).

In response, the Government noted that the PCAST Report actually supported admitting expert fingerprint testimony. (Doc. 76 at 4.) Although the NRC Report had questioned the validity of fingerprint analysis in 2009, that report prompted the research that led to the PCAST Report in 2016, which ultimately concluded: "PCAST finds that *latent fingerprint analysis is a foundationally valid subjective methodology*." (*Id.* at 4-5 (quoting the PCAST Report at 101)). The Government further noted that (i) fingerprint analysis was a well-established scientific discipline, (ii) federal courts routinely admit expert testimony on fingerprint comparisons without a *Daubert* hearing, (iii) other courts had rejected similar arguments based on the NRC and PCAST Reports, and (iv) the defendants provided no justification for a *Daubert* hearing in this case. (*See id.* at 4-7.)

---

[2] The NRC Report is available online at: https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf (last visited Mar. 31, 2022).

[3] This PCAST Report is available at: https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf, (last visited Mar. 31, 2022).

At the pretrial conference, Ware renewed his motion to exclude any fingerprint testimony and claimed, incorrectly, that the PCAST Report "basically says that until fingerprint evidence reaches a higher level, it should not be used as the subject of expert testimony in a criminal case." (Doc. 293 at 21.) In the absence of any cases accepting the defendants' arguments, which had been rejected by other courts, the district court ruled that no *Daubert* hearing was necessary. (*See id.*) The court noted that Ware could make his points to the jury regarding any criticisms of fingerprint analysis. (*Id.*)

### b.  The Lay Opinion Identification Motion

Ware also moved to preclude law enforcement witnesses from testifying that they recognized Ware in photographs or videos. (Doc. 183 at 1-2.) In response, the Government argued that such testimony was admissible from the two FBI case agents because they were more likely than the jury to correctly identify Ware in photos and videos taken around the time of the robberies, which occurred nearly two years before trial. (Doc. 190 at 1-5; Doc 29.) The agents had spent significant time with Ware shortly after the robberies, and Ware had subsequently changed his appearance. (Doc. 190 at 4; Doc. 296 at 440.) The district court ruled that such lay opinion identification testimony was admissible, and that Ware could point out to the jury his criticisms of such identifications. (Doc. 293 at 12-17.)

### 2. Trial

On July 29, 2019, trial commenced as to the nine robberies, all of which occurred in Atlanta or the surrounding suburbs. (*See* Doc. 198; Doc. 173.) Over four days, the Government called 30 witnesses and introduced over 160 exhibits. (*See* Docs. 198, 200, 203, and 205; *see also* Doc. 294 at 2; Doc. 295 at 118; Doc. 296 at 343.) In rebuttal, Ware called two witnesses and introduced approximately ten exhibits. (*See* Docs. 198, 200, 203, and 205; *see also* Doc. 297 at 579.) At the conclusion of the trial, the jury convicted Ware of participating in all nine robberies. (Docs. 206, 209.) Among the evidence of Ware's guilt that the jury heard was the following:

### a. First Robbery (alleged only in the conspiracy count) – October 7, 2017, at Spring Spa

At around 1:12 a.m. on October 7, 2017, an armed robbery occurred at Spring Spa in Atlanta. (Doc. 295 at 214-16, 289.) A victim testified that she saw a young black male with a pistol, so she ran out a side door, flagged down a taxi, and used the driver's cell phone to call 911. (*Id.* at 217-18.) While the victim was calling 911, she saw the man with the gun and two other men leave in a dark red vehicle. (*Id.* at 218-20.)

Agents later examined Ware's telephone pursuant to a search warrant. (*Id.* at 279.) In the web history, agents discovered that

approximately two hours before the robbery, Ware searched for "1996 Manchester Street NE, Atlanta, Georgia 30324," which was the address of Spring Spa. (*Id.* at 288-89; Gov't Ex. 187.)

Agents also obtained cell-site location information that indicated Ware's cell phone was near Spring Spa around the time of the robbery. (Doc. 296 at 471; Gov't Ex. 229 at 7.)

> **b. Second Robbery (alleged in the conspiracy count and in Counts 2 and 3) – October 10, 2017, at Cedar Massage**

At around 10:10 p.m. on October 10, 2017, three days after the Spring Spa robbery, an armed robbery occurred at Cedar Massage in Atlanta. (Doc. 294 at 72; Doc. 295 at 289; Gov't Ex. 22.) Based on surveillance video and victims' testimony, the jury learned that two young, thin black males entered the business and asked about the price of a massage; then one of the men pulled out a pistol and demanded money from an employee. (Doc. 294 at 72-75; Gov't Ex. 22.) The robber with the handgun, later identified as Smith, wore a red jacket and a baseball cap, and had a tattoo on his face. (Doc. 294 at 76-77; Gov't Exs. 22, 23, 26.) He carried the handgun in his left hand and wore what appeared to be a gold watch on his left wrist. (Doc. 294 at 90; Gov't Exs. 22, 26.) The second robber, later identified as Ware, wore a gray hooded sweatshirt with the hood up. (Doc. 294 at 90; Gov't Exs. 22, 24.)

8

A detective who responded to the robbery that night viewed video surveillance footage that showed the second robber picking up a mint from a tray on a counter, placing it in his mouth with the wrapper on, pulling the wrapper off with his teeth, and placing the wrapper back in the tray. (Doc. 294 at 87-91; Gov't Ex. 22.) The detective collected the mint wrapper as evidence. (Doc. 294 at 91.) Later, an FBI Lab analyst matched DNA found on the wrapper to Ware. (Doc. 296 at 535-38.)

In the web history of Ware's cell phone, agents discovered that a few days before the robbery, Ware searched for "6035 Bakers Ferry Road #230, Southwest, Atlanta, Georgia 30336," which was the address of Cedar Massage. (Doc. 295 at 289; Gov't Ex. 188.)

### c. Third Robbery (alleged in the conspiracy count and in Counts 4 and 5) – October 13, 2017, at Qi Clay Sauna

At approximately 11:15 p.m. on October 13, 2017, three days after the Cedar Massage robbery, an armed robbery occurred at Qi Clay Sauna in Doraville. (Doc. 293 at 13-16; Gov't Ex. 1.) Based on surveillance video and victims' testimony, the jury learned that two young, thin black males entered the business, acted like customers, and asked about massages (even though the business did not offer massages). (*Id.* at 18, 31; Gov't Ex. 1.) The robbers then pulled out their pistols and demanded money. (Doc. 293 at 18-19; Gov't Ex. 1.)

9

The first robber, later identified as Smith, wore a gray sweatshirt and a black winter hat. (Gov't Exs. 1, 3.) He carried his gun in his left hand and appeared to be wearing a gold watch on his left wrist. (Doc. 293 at 22; Gov't Exs. 1, 3.) The second robber, later identified as Ware, carried his gun in his right hand and wore a distinctive hooded sweatshirt with the hood up and with "Dope Sport" printed on the back. (Doc. 293 at 23; Gov't Exs. 1, 2, 4-6.) A tattoo was visible on Ware's left forearm/wrist. (Doc. 293 at 23; Gov't Exs. 1, 4-6.)

Ware cornered a victim employee behind the desk, stuck a gun in his face, and said, "I will kill you motherfucker." (Doc. 294 at 18; Gov't Exs. 1, 4-6.) While stealing money from the cash register, Ware repeatedly struck the victim's head with a handgun, knocking the man to the floor and opening a bloody gash on the man's forehead that later required stitches. (Doc. 294 at 19, 23; Gov't Exs. 1, 4-7, 9-10.) As Ware was pistol-whipping the victim, the magazine of Ware's gun fell to the floor. (Doc. 294 at 20.)

When Smith and Ware exited the spa, the owner followed them out to the parking lot, but Smith fired a shot in the air to scare her back. (*Id.* at 34-35; Gov't Ex. 1.) Smith and Ware then fled in a red four-door sedan that had been parked outside. (Doc. 294 at 34; Gov't Exs. 1, 8.)

10

Law enforcement officers who responded to the scene found the pistol magazine that Ware had dropped – a .40 caliber Smith & Wesson magazine. (Doc. 294 at 38-39, 45-53; Doc. 295 at 292-93; Gov't Exs. 14, 15.) Later, an FBI Lab analyst matched DNA found on the magazine to Ware. (Doc. 296 at 532-35.)

In the web history of Ware's cell phone, agents discovered that the day after Ware lost his magazine at Qi Clay, he searched for "who sale S & W extended clip." (Doc. 295 at 291-92; Gov't Ex. 191.)

### d. Fourth Robbery (alleged only in the conspiracy count) – October 20, 2017, at Lush Nails and Spa

At approximately 7:42 p.m. on October 20, 2017, a week after the Qi Clay robbery, an armed robbery occurred at Lush Nails and Spa in the Buckhead area of Atlanta. (Doc. 295 at 223-24.) A victim testified that two young, thin black males entered the business, brandished handguns, pointed the guns at the victims and said, "Nobody moves." (*Id.* at 225.) The robbers struck several victims with handguns, kicked one woman in the face when she touched her purse, and knocked another woman to the floor. (*Id.*) One robber then put a gun to the head of the woman on the floor and said, "I will fucking kill you bitch. I will fucking kill you. Are you on the phone?" (*Id.*) The robbers then fled with cash and personal items they stole from the business's customers. (*Id.*)

11

Agents obtained cell-site location information that indicated Ware's cell phone was near Lush Nails around the time of the robbery. (Doc. 296 at 471-72; Gov't Ex. 229 at 8.)

### e.  Fifth Robbery (alleged in the conspiracy count and in Counts 6 and 7) – October 24, 2017, at Kochi Maru

At approximately 11:20 p.m. on October 24, 2017, four days after the Lush Nails robbery, an armed robbery occurred at Kochi Maru restaurant in Doraville. (Doc. 295 at 120; Gov't Ex. 37.) Based on surveillance video and victims' testimony, the jury learned that two young, thin black males entered the restaurant and asked about massages (even though the restaurant did not offer massages). (Doc. 295 at 130; Gov't Ex. 37.) The first robber, later identified as Smith, wore a red or orange t-shirt, black pants with a red stripe down the side, and a multi-colored winter cap. (Gov't Ex. 37; Doc. 295 at 145.) The second robber, later identified as Ware, wore a black hooded sweatshirt with the hood up. (Gov't Ex. 37; Doc. 295 at 145.)

Shortly after asking about massages, Smith and Ware brandished handguns. (Gov't Ex. 37.) Smith, who held his gun in his left hand and had a gold watch on his left wrist, took the restaurant's owner to the cash register and rummaged around the area. (*Id.*; Doc. 295 at 145.) Meanwhile, Ware, who held his gun in his right hand, approached a group of customers seated at a table. (Gov't Ex. 37; Doc.

12

295 at 145.) As Ware attempted to steal one customer's purse, he fired his handgun, shooting the legs of two women at the table. (Doc. 295 at 121-23, 134-35; Gov't Ex. 37.) Ware then ran back toward the front of the restaurant, but instead of heading out the door, which was to his left, he detoured a few steps to his right, deliberately pointed his handgun at the owner, who was now kneeling face down behind the counter, paused, and shot her in the back from point-blank range before fleeing. (Doc. 295 at 131; Gov't Exs. 37, 70.) Miraculously, the owner survived, although she underwent major surgery and suffers from serious pain to this day. (Doc. 295 at 131-32.)

Investigators recovered bullets and shell casings from the restaurant and concluded that Ware shot the three women with a .40 caliber handgun. (Doc. 295 at 140-41, 146; Gov't Exs. 42, 45, 46; Doc. 295 at 293.)

Surveillance video from shortly before the robbery showed a red four-door sedan with tinted windows and a sunroof pull up in front of a nearby karaoke bar. (Doc. 295 at 147-52; Gov't Exs. 62-65.) Two individuals wearing the same distinctive clothing as the robbers exited the passenger side of the car, while a driver waited in the car. (Doc. 295 at 152-53; Gov't Ex. 63.) The two individuals exited the karaoke bar minutes later and reentered the passenger side of the car, which

then drove off toward the Kochi Maru restaurant. (Doc. 295 at 154-55; Gov't Ex. 63.)

### f. Sixth Robbery (alleged only in the conspiracy count) – November 3, 2017, at Royal Massage

At approximately 6:00 or 7:00 p.m. on November 3, 2017, ten days after the Kochi Maru robbery, an armed robbery occurred at Royal Massage in Norcross. (Doc. 296 at 345; Gov't Ex. 113.) Based on surveillance video and a victim's testimony, the jury learned that two young, thin black males entered the business, brandished handguns, and demanded money. (Doc. 296 at 346-48; Gov't Ex. 113.) The first robber, later identified as Smith, held his gun in his left hand and wore the same distinctive hooded sweatshirt with "Dope Sport" printed on the back that Ware had worn in the earlier Qi Clay robbery. (Gov't Exs. 113, 119, 121, 122.) The second robber, later identified as Ware, held his gun, which had an extended magazine, in his right hand and wore a black hooded sweatshirt with the hood up. (Gov't Ex. 113.)

After brandishing his handgun, Smith put his arm around a victim's neck from behind, pointed his gun at her head several times, and pushed her behind the front counter. (*Id.*) When another victim appeared from the rear of the business, Ware forced her to the

14

ground at gunpoint. (*Id.*) Smith and Ware then forced both victims to the back of the business. (*Id.*; Doc. 296 at 348.)

After stealing money from the cash register as well as a purse containing cash and personal property, Smith and Ware fled the business and entered a dark red four-door sedan – possibly with tinted windows, a sunroof, and a temporary plate – that had been backed into a parking spot in front of the business and was being driven by a third person. (Doc. 296 at 348, 350-52; Gov't Exs. 113-16, 122.)

In the web history of Ware's cell phone, agents discovered that less than one month before the robbery, Ware searched for "3380 Holcomb Bridge Road," which was right across the street from 3375 Holcomb Bridge where Road Royal Massage was located. (Doc. 295 at 290-91; Gov't Ex. 189.)

Agents also obtained cell-site location information that indicated Ware's cell phone was near Royal Massage around the time of the robbery. (Doc. 296 at 472; Gov't Ex. 229 at 9.)

### g. Seventh Robbery (alleged in the conspiracy count and in Counts 8 and 9) – November 8, 2017, at Empress Massage II

At approximately 8:00 p.m. on November 8, 2017, five days after the Royal Massage robbery, an armed robbery occurred at Empress Massage II in Duluth. (Doc. 295 at 167; Gov't Exs. 72-73.) Based on surveillance video and a victim's testimony, the jury learned that two

15

thin black males, both wearing hooded sweatshirts with the hoods up over winter caps, entered the business and acted like customers. (Doc. 295 at 171-72; Gov't Ex. 73.) Both men quickly brandished handguns and demanded money. (Gov't Ex. 73.) The first robber, later identified as Smith, carried his firearm in his left hand, and the second robber, later identified as Ware, carried his firearm in his right hand. (*Id.*) Smith and Ware stole money from the cash register and fled. (*Id.*; Doc. 295 at 173-74.)

Surveillance video from outside the business showed that Smith and Ware arrived in a dark red four-door sedan with tinted windows and a sunroof. (Gov't Exs. 72, 74.) The sedan backed into a parking spot in front of the business, and then Smith and Ware both appeared to exit the passenger side. (Gov't Ex. 72.) A minute or two later, after the robbery, the robbers both reentered the passenger side of the sedan, and it quickly sped away from the scene. (*Id.*)

Agents obtained cell-site location information that indicated Smith's cell phone was near Empress Massage around the time of the robbery. (Doc. 296 at 473; Gov't Ex. 229 at 10.)

### h. Eighth Robbery (alleged only in the conspiracy count) – November 8, 2017, at BD Spa and Wellness Massage

At approximately 8:50 p.m. on November 8, 2017, less than an hour after the Empress Massage robbery, an armed robbery occurred

16

at BD Spa and Wellness Massage in Stone Mountain. (Doc. 295 at 235-36; Gov't Ex. 128.) Based on surveillance video, the jury learned that two young, thin black males entered the business and acted like customers, waiting in the reception area until an employee came out to greet them. (Gov't Ex. 128.) The first robber, later identified as Smith, wore a gray Adidas zip-up hooded sweatshirt with blue sleeves, without the hood up, a dark winter hat, dark pants with a white stripe down the side, and Timberland-style boots. (*Id.*) The second robber, later identified as Ware, wore a light gray zip-up hooded sweatshirt with the hood on, dark pants, and tennis shoes. (*Id.*)

After the employee greeted Smith and Ware, Ware drew a handgun, which he held in his right hand, and forced the employee to the back of the business where he knocked her to the ground. (*Id.*) Once in the back, Ware confronted a customer that was in a back room. (*Id.*) While Ware was doing so, the employee escaped out the business's rear door. (*Id.*) Smith and Ware then fled with the loot they had stolen. (*Id.*) Shortly after they left the spa, what appeared to be a red four-door sedan quickly drove away from the business. (*Id.*)

### i. Ninth Robbery (alleged in the conspiracy count and in Counts 10 and 11) – November 10, 2017, at New You Massage

At approximately 8:52 p.m. on November 10, 2017, two days after the Empress Massage and BD Spa robberies, an armed robbery

occurred at New You Massage in Roswell. (Doc. 295 at 177-79, 193; Gov't Ex. 81.) Based on surveillance video and a victim's testimony, the jury learned that two young, thin black males and a third black male who appeared to be of average build entered the business and acted like customers. (Doc. 295 at 180-81; Gov't Ex. 81.) One of the men requested a massage. (Doc. 295 at 181.) The three men then brandished handguns and demanded money. (*Id.* at 182-83; Gov't Ex. 81.) The first robber, later identified as Smith, had a tattoo under his right eye. (Gov't Exs. 81, 83.) He wore a fanny pack, a winter hat, and a hooded sweatshirt without the hood up and carried his gun in his left hand. (Gov't Ex. 81.) The second robber, later identified as Ware, wore a hooded sweatshirt with the hood up and Nike shorts over pants and carried his gun in his right hand. (Gov't Exs. 81, 83-84.) The third robber, who has not been publicly identified, wore a hooded sweatshirt with a hood up over a baseball cap. (Gov't Ex. 81.)

Smith rifled through the front desk drawer and then dragged an employee across the floor. (*Id.*) Meanwhile, Ware and the third robber stole wallets, phones, and purses from employees and customers. (Doc. 295 at 184-85.) During the robbery, Ware hit several victims in the head with his handgun, which had an extended magazine. (Gov't Exs. 81, 83-84.) After the robbers left the business, witnesses saw them enter a red four-door sedan that was backed into a parking spot in

18

front of the business with a driver waiting. (Doc. 295 at 193-94.) The sedan then fled. (*Id.*)

Among the items the robbers stole was one victim's cell phone. (Doc. 295 at 185.) Within a day or so after the robbery, the victim used another cell phone to obtain location information about her stolen phone and discovered that it was located near Exit 5 of Georgia Highway 400. (*Id.* at 185-86, 191.) The victim and her husband drove to the spot where the phone was and realized it was in the median, so they called the police, who retrieved the phone. (*Id.* at 186, 191-92.) Investigators found one fingerprint suitable for comparison on the phone. (*Id.* at 196-97, 205-08; Gov't Exs. 87, 235.) Later, a GBI Lab analyst found that the print on the phone matched a known print from Ware's left middle finger. (Doc. 296 at 495-98; Gov't Exs. 235-36.)

At trial the Government introduced the fingerprint comparison evidence through the expert testimony of a GBI fingerprint examiner. (Doc. 296 at 485-98.) Ware did not object to the examiner's qualifications when the Government tendered her as an expert witness in fingerprint examinations and comparisons. (*Id.* at 488.) But Ware cross-examined the expert about the limitations of fingerprint analysis. (*Id.* at 498-518.)

In the web history of Ware's cell phone, agents discovered that about an hour after the New You robbery, Ware searched for "Channel 2 News Most Wanted." (Doc. 295 at 293; Gov't Ex. 192.)

Agents also obtained cell-site location information that indicated Ware's and Smith's cell phones were near New You around the time of the robbery. (Doc. 296 at 473; Gov't Ex. 229 at 11.)

### j.   The Arrests of Smith and Ware

On November 10, 2017, the day of the New You robbery, Atlanta media aired an FBI press release that sought the public's help in identifying the perpetrators of this seemingly related string of robberies. (Doc. 295 at 253-54.) The press release included a description of the robbers and their getaway car, along with video and still photographs from several of the robberies. (*Id.*) Within a week, FBI agents gathered sufficient evidence to obtain arrest warrants for Smith and Ware. (*Id.* at 254.)

On November 21, 2017, FBI agents arrested Smith at his mother's house. (*Id.*) When agents arrived, Smith hid in a closet. (*Id.*) At the house, agents found several items linked to the robberies, including what appeared to be the jacket Smith wore during the Cedar Massage robbery, the pants he wore during the Kochi Maru robbery, the hat he wore during the Royal Massage robbery, and the fanny pack he wore during the New You robbery. (*Id.* at 257-62.)

20

In Smith's jacket, agents located a set of car keys. (*Id.* at 258-59.) Later that day, at Smith's grandmother's residence, agents found the car to which the keys belonged, a four-door sedan with tinted windows and a sunroof, all of which matched the getaway car. (*Id.* at 296-98; Gov't Ex. 199.) Although the car was white instead of red, agents quickly discovered based on the car's registration—and by looking under the hood and trunk and inside the doors—that the car had originally been red and had been painted over. (Doc. 295 at 297-302; Gov't Exs. 205-210.) Inside the car, agents recovered a temporary vehicle tag, Korean currency, and several items that were later found to have DNA matching Ware's and Smith's. (Doc. 296 at 415-425, 543-550.)

On November 22, 2017, FBI agents tracked Ware's cell phone to a residence in Stone Mountain. (Doc. 295 at 263.) After setting up surveillance on the residence, agents saw an individual in a hooded sweatshirt exit the residence and drive away. (*Id.*) Unsure whether it was Ware, agents pulled the car over only to discover it was Ware's roommate. (*Id.* at 263-64.) At that point, because agents had revealed themselves and "the cat was out of the bag," agents knocked on Ware's door and told the woman who answered, Ware's girlfriend, that they were there to arrest Ware. (*Id.* at 264-65.) She allowed them

to enter, and they eventually found Ware hiding under a bed upstairs. (*Id.* at 265.)

After arresting Ware, agents searched the residence and found several items linked to the robberies, including what appeared to be the sweatshirt Ware wore during the Cedar Massage, Empress Massage, and BD Spa robberies, the shorts and sweatshirt he wore during the New You robbery, and an extended magazine like the one he used during the Royal Massage and New You robberies. (*Id.* at 266-78.)

Agents also found a cell phone under the bed with Ware. (*Id.* at 278-79; Gov't Ex. 131.) Agents concluded the phone was Ware's for several reasons: it used the number that agents had tracked to find him, it contained text messages addressed to him by name, its call log included numerous calls to/from numbers associated with Smith, and it contained "selfie" pictures of Ware, including one that showed a tattoo on his left forearm that appeared to match the one that could be seen in the Qi Clay robbery surveillance footage. (Doc. 295 at 281-87.) FBI Special Agent Matt Winn testified he could identify the selfies on the phone as depicting Ware because he had spent approximately an hour with Ware after his arrest. (*Id.* at 282; Doc. 190 at 4.)

In the web history of Ware's cell phone, agents discovered that in the days after the FBI's press release about the robberies, Ware had reviewed "Channel 2 News most wanted" along with articles that included information from the press release, including the photos, video clips, and descriptions of the robbers and the getaway car. (Doc. 295 at 293-94.) Agents also discovered that after viewing these articles, Ware had searched the Internet using such phrases as, "what kind of phones can be traced by law," his name, and "who buy cars." (*Id.* at 294-96.) Ware also received a text on November 17, 2017, that read, "And stay yo ass off IG and Facebook if you wanted by the FBI." (*Id.* at 296.)

### k. Lay Opinion Identification Testimony

FBI Special Agent Paul Costa testified that he participated in Ware's arrest, which occurred only twelve days after the last of the robberies. (Doc. 296 at 438-39.) Agent Costa explained he spent at least four hours with Ware that day. (Doc. 296 at 439-40). After the arrest, he let Ware smoke a cigarette, and then interviewed him. (*Id.* at 440.) Following the interview, he spent time waiting with Ware in a hospital after Ware began to feel ill. (*See id.*; Doc. 190 at 4.)

Agent Costa testified that Ware had changed his appearance in the nearly two years that had elapsed between the robberies and the trial,

23

including by growing out his hair such that it obscured his face, and by aging and gaining some weight. (*Id.* at 440.)

Based on his interactions with Ware around the time of the robberies and his close and repeated review of the many robbery videos, Agent Costa identified six screenshots, out of the hours of admitted footage, in which he believed he could identify Ware even though Ware had attempted to disguise his appearance by having a hood up. (*Id.* at 441-43 (discussing Gov't Exs. 5 (Qi Clay), 58 (Kochi Maru), 82 & 85 (New You), 117 (Royal Massage), and 129 (BD Spa)).

### 3.  Jury Charges and Verdict

At the charge conference, the Government proposed including the Eleventh Circuit Pattern Jury Instruction on "Evidence of Flight," which is Special Instruction S19. (Doc. 199 at 14.) In opposition, Ware argued that there was insufficient evidence of flight or concealment in the case to include the charge. (Doc. 297 at 589.) The district court ruled that it would give the charge based on the evidence of Ware hiding under his bed. (*Id.*) Ware did not suggest any modifications or additions to the charge after the ruling. (*Id.*)

The district court ultimately included the evidence of flight pattern charge in the jury instructions. (Doc. 297 at 653.) Among other charges, the court also included the Eleventh Circuit Pattern Jury Instructions on "Identification Testimony," which is Special

Instruction S3, and "Expert Witness" testimony, which is Basic Instruction B7. (*Id.* at 652-53.)

After deliberating for approximately seven hours, the jury returned a verdict of guilty on all counts. (Doc. 297 at 666-67; Doc. 298 at 669-71; Doc. 209.)

### 4. Sentencing

At sentencing, the district court found that Ware's prior convictions placed him in Criminal History Category IV. (Doc. 299 at 8.) For each of the nine robberies proved at trial, the court calculated the total offense level under § 2B3.1, the robbery guideline, applying enhancements where appropriate for the use of firearms, § 2B3.1(b)(2); any bodily injuries, § 2B3.1(b)(3); and the physical restraint of victims to facilitate the offense or escape, § 2B3.1(b)(4)(b). (*Id.* at 5-9.)

As to the Kochi Maru restaurant robbery, the court found that Ware intended to kill the restaurant owner when he shot her in the back from point-blank range. (*Id.* at 17; *see also* Doc. 277 at 10-11.) Accordingly, the court chose to depart upward in accordance with § 2B3.1 n.5, which references the attempted murder guideline, § 2A2.1. (Doc. 299 at 17; *see also* Doc. 277 at 10-11.)

Relevant to this appeal, Ware objected to the physical restraint enhancement as to three of the robberies: Lush Nails (robbery #4),

Royal Massage (#6), and BD Spa & Wellness (#8).[4] (*See* Doc. 295 at 4-5.) But the Government highlighted evidence of physical restraint at all three robberies. (Doc. 277 at 4-5; Doc. 299 at 3-4.) For instance, at Lush Nails, Smith and Ware assaulted and threatened victims at gunpoint and forced at least one victim to the floor. (Doc. 295 at 225.) At Royal Massage, Ware knocked one victim to the floor at gunpoint, and Smith and Ware together forced both victims to the back of the business at gunpoint before fleeing. (Gov't Ex. 113.) And at BD Spa, Ware forced one victim at gunpoint to the back of the business and shoved her to the floor before cornering another victim in a back room. (Gov't Ex. 128.)

The district court overruled Ware's objections, finding that Smith and Ware's conduct in these three robberies merited the 2-level enhancement under § 2B3.1(b)(4)(B), which applies when "any person is physically restrained to facilitate commission of the offense or to facilitate escape." (See Doc. 299 at 4-5.)

---

[4] Although the district court found the physical restraint enhancement applied to eight of the nine robberies, and Ware objected to each finding, only these three robberies affected Ware's offense level after the court's upward departure. (*See* Doc. 299 at 4-8; Doc. 277 at 11; *see also* Doc. 299 at 17.) Accordingly, Ware appeals the district court's application of the restraint enhancement only with respect to these three robberies. (Appellant's Br. at 45.)

Then, accounting for its upward departure and the applicable grouping rules, the district court found that Ware's total offense level was 40. (*See* Doc. 299 at 17; *see also* Doc. 277 at 11.) At Criminal History Category IV, Ware's custodial guideline range was 360 months to life. (*Id.*) Because the jury also convicted Ware on five counts of violating § 924(c) – two for discharging a firearm during robberies and three for brandishing a firearm during robberies – which required a total mandatory consecutive sentence of 41 years, the total guideline range became 852 months to life. (*See* Doc. 299 at 17; *see also* Doc. 277 at 11.) The district court sentenced Ware to prison for life. (Doc. 299 at 28-31; Doc. 279.)

### C. Standard of Review

1. This Court reviews a district court's denial of a request for a *Daubert* hearing for abuse of discretion. *United States v. Hansen*, 262 F.3d 1217, 1233 (11th Cir. 2001).

2. This Court reviews a district court's admission of lay opinion identification testimony for abuse of discretion. *United States v. Knowles*, 889 F.3d 1251, 1255 (11th Cir. 2018); *United States v. Pierce*, 136 F.3d 770, 775 (11th Cir. 1998).

3. This Court reviews a district court's decision to give a particular jury instruction over a defendant's objection for abuse of

discretion. *United States v. Williams*, 541 F.3d at 1087, 1089 (11th Cir. 2008).

4. When reviewing the application of a guidelines sentencing enhancement, this Court reviews the sentencing court's findings of fact for clear error and its application of the guidelines de novo. *United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013).

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion by admitting expert fingerprint testimony without a *Daubert* hearing. Given the widespread, longstanding acceptance of latent fingerprint analysis by courts across the nation, no *Daubert* hearing was necessary unless Ware raised a novel challenge to the reliability of fingerprint analysis. Ware did not. Instead, he pointed to two studies from 2009 and 2016 that suggested ways to improve fingerprint analysis while ultimately confirming that fingerprint analysis is a valid methodology.

The district court also did not abuse its discretion by admitting lay opinion identification testimony by two FBI agents. Because those agents spent considerable time with Ware shortly after the robberies, and because Ware changed his appearance in the two years between the robberies and his trial, the agents were uniquely qualified to be helpful to the jury in recognizing Ware in the surveillance photos and in selfies on his phone.

The district court did not abuse its discretion by instructing the jury using the Eleventh Circuit's pattern instruction on evidence of flight. Trial evidence supported inferences that when the FBI came to arrest Ware, Ware hid under a bed because he was trying to avoid capture for the robberies that he had committed. Internet searches and a text message on Ware's phone confirmed that, shortly before

29

his arrest, he was aware the FBI was searching for him in connection with the robberies and that he was trying to evade capture, including by trying to learn what phones law enforcement could trace and how he could sell the getaway car.

Finally, the district court properly applied a 2-level enhancement to Ware's guidelines with respect to three robberies because Ware and his co-defendant physically restrained several victims to facilitate the offenses. In each robbery, Ware and his co-defendant threatened victims at gunpoint to prevent their escape and either knocked victims to the ground, moved victims to another location in the business, or both assaulted and moved victims.

ARGUMENT AND CITATIONS OF AUTHORITY

**1. The District Court Did Not Abuse Its Discretion by Admitting Expert Testimony Regarding Latent Fingerprint Analysis Without First Holding a *Daubert* Hearing.**

The mountain of evidence of Ware's guilt included one fingerprint – the print he left on the cell phone that the robbers took from a victim at New You Massage in the ninth and final robbery. (Doc. 295 at 185.) A day after the robbery, the victim used another cell phone to ping her stolen phone, which police retrieved from the median of Georgia Highway 400. (*Id.* at 185-92.) A GBI fingerprint analyst testified that a print on the phone matched Ware's left middle finger. (Doc. 296 at 495-98; Gov't Exs. 235-36.) American courts have admitted fingerprint identification evidence for more than a century. *See* Francine Uenuma, *The First Criminal Trial That Used Fingerprints as Evidence*, Smithsonian Magazine (Dec. 5, 2018), https://www.smithsonianmag.com/history/first-case-where-fingerprints-were-used-evidence-180970883/ (last visited Mar. 31, 2022). In his lead argument in this appeal, Ware argues that he should receive a new trial because the district court admitted the evidence of his fingerprint on the cell phone without first conducting a hearing on its admissibility. (Appellant's Br. at 21-28.) But as this Court has held, the district court did not abuse its discretion in

31

admitting the evidence without a *Daubert* hearing. *See United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005). Moreover, in light of the substantial evidence of Ware's guilt, any error in the admission of the fingerprint was harmless.

In determining the admissibility of expert testimony, district courts must consider whether (1) the expert is qualified, (2) the expert's methodology is reliable, and (3) the expert's testimony would be relevant. *Abreu*, 406 F.3d at 1306. Ware did not challenge the qualifications of the Government's fingerprint expert or the relevance of her testimony. (Doc. 75 at 2.) Accordingly, only the reliability of fingerprint identification evidence is at issue.

Ware argues only that the validity of the expert's methodology – latent fingerprint analysis – had been called into question by two government reports: the 2009 NRC Report and the 2016 PCAST Report, which followed up on the earlier NRC Report. (Appellant's Br. at 23-28.) But Ware ignores the PCAST Report's ultimate finding that "latent fingerprint analysis is a foundationally valid subjective methodology." PCAST Report at 101. Even more pointedly, Ware ignores an addendum to the PCAST Report, which made clear that "there was clear empirical evidence" that latent fingerprint analysis "met the threshold requirements of 'scientific validity' and 'reliability' under the Federal Rule of Evidence." PCAST, *An Addendum to the*

*PCAST Report on Forensic Science in Criminal Courts* 2,

https://obamawhitehouse.archives.gov/sites/default/files/microsites/

ostp/PCAST/pcast_forensics_addendum_finalv2.pdf (last visited

Mar. 31, 2022).

As this Court held in *Abreu*, in the absence of any novel challenges

to the reliability of latent fingerprint analysis, the district court did

not abuse its discretion in admitting the expert testimony without a

*Daubert* hearing given the widespread, longstanding acceptance of

fingerprint testimony by courts across the nation. *Abreu*, 406 F.3d at

1307.

There is no doubt that under *Daubert*, district courts play a

"gatekeeping role" in ensuring the relevance and reliability of expert

testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597

(1993).  As the gatekeeper, however, a court has "considerable leeway

in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 152 (1999). And there is no requirement of holding a

*Daubert* hearing prior to the admission of expert testimony. *See Cook ex*

*rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113

(11th Cir. 2005); *see also Kumho Tire*, 526 U.S. at 152 (recognizing that

the reliability of an expert's methods may be "properly taken for

granted" and that district courts have discretion to "avoid unnecessary

33

'reliability' proceedings in ordinary cases"). After all, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Accordingly, "a district court would not abuse its discretion by limiting, in a proper case, the scope of a *Daubert* hearing to novel challenges to the admissibility of latent fingerprint identification evidence–or even dispensing with the hearing altogether if no novel challenge was raised." *United States v. Mitchell*, 365 F.3d 215, 246 (3d Cir. 2004). Indeed, given that fingerprint analysis has been well-established in the court system for "over a century and has been routinely subject to peer review," courts have regularly allowed fingerprint examiners to provide expert testimony without first holding a *Daubert* hearing. *See, e.g., United States v. John*, 597 F.3d 263, 275 (5th Cir. 2010), *abrogated on other grounds by Van Buren v. United States*, 151 S. Ct. 1648 (2021); *United States v. Pena*, 586 F.3d 105, 110 (1st Cir. 2009) (holding that fingerprint identification evidence can be admitted without a *Daubert* hearing because "the case law is overwhelmingly in favor of admitting fingerprint experts"); *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) (in context of fingerprint evidence, "a trial judge need not expend scarce judicial

34

resources reexamining a familiar form of expertise every time opinion evidence is offered"); *see also Abreu*, 406 F.3d at 1307 (holding that this Court would join other circuits that had held fingerprint evidence satisfied *Daubert*, and noting "the district court did not clearly err in giving greater weight to the general acceptance factor").

After issuance of the NRC and PCAST Reports, courts still routinely admit expert fingerprint testimony as reliable evidence, frequently without a *Daubert* hearing. *See, e.g., United States v. Hood*, 846 F. App'x 825, 829 (11th Cir. 2021) (unpublished) ("In determining that the evidence was reliable, the district court acted in accordance with our caselaw and the decisions of other circuits that have upheld such evidence as reliable under *Daubert*, notwithstanding the subjective nature of the ACE-V method. In addition, Hood was able to attack the expert's methodology through cross-examination at trial, and the district court instructed the jury as to the burden of proof and the nature of expert testimony."); *United States v. Pitts*, No. 16-CR-550, 2018 WL 1116550, at *4-*6 (E.D.N.Y. Feb. 26, 2018) (rejecting arguments nearly identical to those Ware raised here without holding a *Daubert* hearing); *United States v. Bonds*, No. 15 CR 573-2, 2017 WL 4511061, at *1-*3 (N.D. Ill. Oct. 10, 2017), *aff'd*, 922 F.3d 343 (7th Cir. 2019) (similarly rejecting arguments nearly

identical to those Ware raised here, seemingly without holding a *Daubert* hearing).

Ware is wrong when he argues that the NRC and PCAST Reports "clearly establish that there is conflicting testimony and expert opinion about the reliability of fingerprint comparison evidence." (*See* Appellant's Br. at 26.) The PCAST Report's suggestions that Ware recites – *e.g.*, that jurors should be informed that false positive rates are much higher than the general public realizes, and that fingerprint experts should not overstate the level of accuracy (*id.* at 25-26) – did not change the PCAST Report's ultimate conclusion that latent fingerprint analysis is reliable. Rather, the Report's suggestions for improvement provided proper grounds for cross-examining fingerprint experts, which is exactly what Ware did at trial. (*See* Doc. 296 at 498-518.) Accordingly, the district court did not abuse its discretion in admitting the expert fingerprint testimony without first holding a *Daubert* hearing.

Furthermore, even assuming arguendo that it was error to admit the testimony, any such error was harmless. "Evidentiary errors 'do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights.'" *United States v. Drury*, 396 F.3d 1303, 1315 (11th Cir. 2005) (quoting *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990)).

36

"[W]here an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Barton*, 909 F.3d 1323, 1337 (11th Cir. 2018) (quoting *Drury*, 396 F.3d at 1315).

In *Barton*, this Court held that any error in admitting DNA evidence was harmless where other evidence of the defendant's guilt was overwhelming. *Barton*, 909 F. 3d at 1338. The Court further noted that "proper instruction to the jury on weighing expert testimony may render errors in admitting the evidence harmless." *Id.* Thus, the fact that the district court had charged the jury using this Circuit's pattern jury instruction on expert testimony bolstered the *Barton* Court's conclusion that any error in admitting the expert testimony was harmless. *Id.*

Here, as in *Barton*, any error in admitting expert testimony was harmless because the other evidence of Ware's guilt was overwhelming. The fingerprint evidence concerned only one print found on a victim's phone that was stolen during the robbery at New You Massage. (Doc. 295 at 177-208; 495-98; Gov't Exs. 235-36.) Even without that fingerprint evidence, Ware was linked to the New You Massage robbery through surveillance footage (Gov't Ex. 81), clothes and an extended magazine found at his residence when the FBI arrested him (Doc. 295 at 270-72, 274), cell-site location information

37

(Doc. 296 at 473; Ex. 229 at 11), and evidence of a common modus operandi, including use of the same red four-door sedan as a getaway car (Doc. 295 at 177-84, 193-94). Similarly, overwhelming other evidence linked Ware to the entire string of robberies, including DNA evidence (*see e.g.*, Doc. 296 at 532-38, 543-50), surveillance footage (Exs. 1, 22, 37, 63, 72-73, 81, 113, 128), cell-site location information (Doc. 296 at 471-73; Ex. 229 at 7-11), clothing found at his residence (*see, e.g.*, Doc. 295 at 266-78), searches found on his phone (*see, e.g.*, Doc. 295 at 288-93; Ex. 187-92), and evidence of a common modus operandi (*see, e.g.*, Doc. 293 at 13-16, 18-20, 22-23, 34; Doc. 294 at 72-77, 90; Doc. 295 at 120-23, 130, 134-35, 145, 147-55, 167, 171-74, 177-79, 180-85, 193-94, 218-20, 223-25, 235-36; Doc. 296 at 345-48). Moreover, the district court instructed the jury using this Circuit's pattern jury instruction on expert testimony. For all these reasons, the district court properly admitted the evidence of Ware's fingerprint on the cell phone. But if the court erred, any error was harmless, and Ware's conviction should be affirmed.

2. **The District Court Did Not Abuse Its Discretion by Admitting Lay Opinion Identification Testimony from FBI Agents that Spent Time with Ware Shortly After the Robberies.**

FBI Agents Winn and Costa arrested Ware twelve days after the last robbery. (Doc. 190 at 4; Doc. 295 at 282; Doc. 296 at 438-39.) Agent Costa spent about two hours interviewing Ware, and then

spent a few more hours with Ware at the hospital where he took Ware after the interview. (Doc. 296 at 439; Doc. 190 at 4.) Agent Winn spent about an hour with Ware after his arrest. (Doc. 295 at 282; Doc. 190 at 4.) In the nearly two years between arrest and trial, Ware changed his appearance by growing out his hair to obscure his face, aging, and gaining weight. (Doc. 296 at 440.) Over Ware's objection, the district court permitted the agents to give lay opinion testimony that a robber in some surveillance footage matched Ware's appearance when they arrested him. (Doc. 293 at 12-17.) Ware argues that his convictions must be reversed because the agents' testimony was inadmissible. (Appellant's Br. at 28-34.) Ware is wrong because, as this Court has held, the agents' testimony was likely to help the jury, especially in light of Ware's attempt to change his appearance for trial. *See United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998).

Lay opinion testimony is permitted when it is (1) "rationally based on the witness's perception;" (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue;" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Lay witness identification testimony, in particular, "may be helpful to the jury where . . . 'there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.'" *Pierce*,

39

136 F.3d at 774 (quoting *United Sates v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984)).

"[W]hether a particular witness is better suited than the jury correctly to identify a defendant as the individual depicted in surveillance photographs turns on a number of factors." *Id.* "Perhaps most critical to this determination is the witness's level of familiarity with the defendant's appearance." *Id.* On one end of the spectrum, "familiarity derived from a witness's close relationship to, or substantial and sustained contact with, the defendant weighs heavily in favor of admitting the witness's identification testimony." *Id.* On the other end of the spectrum, "knowledge of the defendant's appearance based entirely on the witness's review of photographs of the defendant and witnesses' descriptions of him does not, as it is not based on anything more than the evidence the jury would have before it at trial." *Id.* (internal quotation marks and alterations omitted).

Other factors that weigh in favor of admitting lay witness identification testimony include whether the witness was familiar with the defendant's appearance near in time to when the surveillance photographs were taken, whether the defendant disguised his appearance at the time of the offense, and whether the defendant's appearance has changed between the time of the offense and trial. *See id.* at 774-75.

Based on these factors, courts routinely admit testimony from witnesses that spent even limited time with the defendant around the time of the robbery. For instance, one court upheld lay opinion testimony from a probation officer that had contact with the defendant four times during a two-month period, totaling more than seventy minutes. *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005). Similarly, another court upheld lay identification testimony from a probation officer that only met with the defendant for five to ten minutes on multiple occasions. *United States v. Contreras*, 536 F.3d 1167, 1171 (10th Cir. 2008). And another court found no error in admitting lay witness identifications by two tellers that merely saw the defendant on the day of the robbery and then testified at trial that he was the man in the surveillance photographs. *United States v. Brannon*, 616 F.2d 413, 417 (9th Cir. 1980).

In contrast, courts preclude lay identification testimony when the witness's familiarity is based solely on photographs rather than in-person observation. *See, e.g.*, *United States v. Jadlowe*, 628 F.3d 1, 24 (1st Cir. 2010) (concluding a witness was in no better person than the jury when the witness simply compared the defendant's driver's license photograph with the surveillance image). Similarly, courts preclude such evidence when the witness's familiarity is remote in time from the offense. *See, e.g.*, *United States v. Fulton*, 837 F.3d 281,

41

299 (3d Cir. 2016) (agents did not observe the defendant until
months after the robbery). In addition, courts preclude such
testimony when the witness's basis for knowledge cannot be explored
on cross-examination. *See, e.g.*, *United States v. Calhoun*, 544 F.2d 291,
295 (6th Cir. 1976) (precluding parole officer's identification because
cross-examination would reveal defendant's criminal record).

Agents Winn and Costa spent approximately an hour with Ware
at the scene of his arrest, which occurred only twelve days after the last
robbery at the end of a month-long spree. (Doc. 190 at 4; Doc. 295 at
282; Doc. 296 at 438-39.) Agent Costa then spent just under two
more hours interviewing Ware, which was followed by another couple
of hours accompanying Ware at the hospital when Ware began feeling
sick. (Doc. 296 at 439; Doc. 190 at 4.) In all, Agent Winn spent
approximately one hour with Ware that day, and Agent Costa spent at
least four hours with him. (Doc. 296 at 438-40; Doc. 190 at 4.)

In addition, Ware had changed his appearance between the time
of the robberies, when the agents spent time with him, and two years
later when the jury encountered him at trial, including by growing out
his hair such that it obscured his face and by aging and gaining a bit
of weight. (*Id.* at 440.)

Thus, Agent Winn spent as much or more time with Ware than
the witnesses in *Beck*, *Contreras*, and *Brannon* spent with the

42

defendants in those cases. And Agent Costa spent hours longer with Ware than did Agent Winn. Because the agents spent this time with Ware close in time to the robberies – and before he had a chance to change his appearance – Agent Winn was better suited than the jury to identify correctly Ware in the selfies found on Ware's phone, and Agent Costa was better suited than the jury to identify Ware correctly as the individual depicted in several surveillance photographs. After all, the jury did not see Ware for the first time until nearly two years after the robberies, by which point his appearance had changed, and the jury saw him from across a courtroom.

Unlike in *Jadlowe*, the agents' familiarity with Ware was not based solely on photographs that the jury could just as easily compare. Unlike in *Fulton*, the agents' familiarity was not remote in time from the robberies. And unlike in *Calhoun*, nothing prevented Ware's counsel from cross-examining the agents with respect to their basis of knowledge regarding Ware's identification. Accordingly, the district court did not abuse its discretion in letting Agent Winn point out selfies of Ware that he found on Ware's phone or in letting Agent Costa point out six screenshots in which he recognized Ware.

This is not a case like *United States v. Hawkins*, 934 F.3d 1251, 1260 (11th Cir. 2019), upon which Ware relies. (Appellant's Br. at 33-34.) In *Hawkins*, a testifying DEA agent was presented as an expert on

43

the drug business, codes, and jargon. *Hawkins*, 934 F.3d at 1261. The agent, however, impermissibly "strayed into speculation and unfettered, wholesale interpretation of the evidence" when he "'interpreted' unambiguous language, mixed expert opinion with fact testimony, and synthesized the trial evidence for the jury." *Id.*

Here, Agents Winn and Costa testified as to their opinion regarding a few images that were but a small piece of the evidence linking Ware to the robberies. Consistent with Rule 701 as interpreted by *Pierce* and the other cases cited above, Agents Winn and Costa testified based on their own perception of Ware to help the jury determine a fact in issue. Given the time they spent with Ware shortly after the robberies before he changed his appearance over the course of the two years before the jury saw him at trial, there was a basis for concluding the agents were more likely to identify Ware from the photographs than was the jury. Accordingly, the district court did not abuse its discretion by admitting this testimony.

Furthermore, even assuming arguendo that the district court erred by admitting the lay opinion identification testimony, "[r]eversal is not warranted 'if the error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict.'" *Knowles*, 889 F.3d at 1255 (quoting *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999)). Here, significant additional evidence

44

tied Ware's phone to him beyond Agent Winn's opinion that selfies on the phone pictured Ware. Specifically, the phone contained a text message addressed to Ware by name, the phone used the number that agents had attributed to Ware and tracked to find him, and the phone's call log included numerous calls to/from numbers associated with Smith. (Doc. 295 at 281-87.) And as noted above, overwhelming evidence linked Ware to the string of robberies even without Agent Costa's identification of six screenshots in which he believed he could identify Ware. Among other evidence before the jury was DNA evidence, cell-site location information, fingerprint evidence, surveillance footage, clothing found at Ware's residence that matched clothing worn by the right-handed robber, searches found on Ware's phone, and evidence of a common modus operandi, including use of the same getaway car. (*See, e.g.*, cites *supra* at 36-37.)

### 3. The District Court Did Not Abuse Its Discretion by Instructing the Jury on Evidence of Flight.

The district court charged the jury on evidence of Ware's flight, based on the evidence that Ware hid under his bed when the agents knocked at the door and told his girlfriend that they were there to arrest Ware. (Doc. 297 at 589.) Ware objected because, he argued, there was insufficient evidence of flight or concealment to support the charge. (*Id.*) Ware did not suggest any modifications or additions to

the charge. (*Id.*) Ware maintains his objection in this appeal, and adds the claim that the district court should have modified the language of the charge. (Appellant's Br. at 34-39.) Ware is wrong because his hiding under his bed to evade arrest is "flight or concealment," and the Government presented ample evidence to satisfy the four-part admissibility test that this Court has used for almost fifty years. *See United States v. Maxi*, 886 F.3d 1318, 1332 (11th Cir. 2018) (citing and quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)).

"[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir. 1982) (quoting *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir. 1970)). "The probative value of flight as evidence of guilt depends on four inferences: '(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.'" *Maxi*, 886 F.3d at 1332 (quoting *Myers*, 550 F.2d

at 1049). An instruction on flight is proper if the evidence supports all four of the necessary inferences. *See Myers*, 550 F.2d at 1050.

Here, plentiful evidence supported all four inferences. As a threshold matter, Ware's choice to hide under an upstairs bed when FBI agents came to arrest him constitutes flight or concealment. As the Fifth Circuit observed when faced with similar facts, "[a]lthough hiding in a closet may not be the standard method of escape, it can still constitute flight where, as in this case, the cornered defendant was attempting to elude capture." *United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999).

Before Ware's arrest, agents had been surveilling his house. (Doc. 295 at 263.) When they saw an individual in a hooded sweatshirt leave the residence, they pulled the car over because they were not sure whether it was Ware. (*Id.* at 263-64.) At that point, because agents had revealed themselves and "the cat was out of the bag," agents knocked on Ware's door and told his girlfriend they were there to arrest Ware. (*Id.* at 264-65.) Ware did not present himself to agents at that point, but instead hid under an upstairs bed until agents found and arrested him. (*Id.* at 265.) Ware's actions demonstrate he was cornered and responded by trying to conceal himself from agents to elude capture.

Turning to Ware's consciousness of guilt and his consciousness of guilt concerning the crime charged at the time of his flight/concealment, the evidence of Ware's phone searches supports the inference that he hid from the FBI because he was wanted in connection with the robberies. On November 10, 2017, the same day as the final robbery, media began airing information from an FBI press release about the robberies, including a description of the robbers and their getaway car along with surveillance footage and still photographs that showed both Ware and Smith. (*Id.* at 253-54.) Over the next several days, Ware searched "Channel 2 News most wanted" and repeatedly viewed the articles about the robberies that included the photos and video clips that depicted him along with descriptions of the robbers and the getaway car. (*Id.* at 293-94.) For instance, on November 14, 15, and 18, 2017, Ware viewed one such article titled, "Robbery crew accused of terrorizing at least nine restaurants, businesses." (*Id.* at 294-95.) Ware then began searching such things as, "what kind of phones can be traced by law," his name, and "who buy cars." (*Id.* at 294-96.) Ware was trying to avoid law enforcement locating him and capturing him for the robberies. And even though Ware's name had not been released to the public, Ware received a text on November 17, 2017, that read, "And stay yo ass off IG and

Facebook if you wanted by the FBI." (*Id.* at 295-96.) Ware thus knew the FBI in particular was after him.

Five days later, when the FBI knocked on his door, he hid not because he was concerned about them arresting him for a probation/parole violation, as he now suggests, but because of his participation in the robberies.

Finally, in light of the overwhelming evidence, discussed above, of Ware's actual guilt of the crimes charged, the evidence supports an inference that Ware's flight/concealment tends to demonstrate his actual guilt of the crime charged. Because the evidence supported all four inferences, the district court did not abuse its discretion when it charged the jury on flight/concealment.

Furthermore, even assuming arguendo that the district court abused its discretion by instructing the jury on evidence of flight, the error would be harmless. "Error in jury instructions does not constitute grounds for reversal unless a reasonable likelihood exists that it affected the defendant's substantial rights." *Williams*, 541 F.3d at 1089 & n.4 ("We also note that even if we saw an abuse of discretion, the district court did not commit reversible error, given the overwhelming evidence of Defendant's guilt."); *see also United States v. House*, 684 F.3d 1173, 1196-97 (11th Cir. 2012) (noting that jury charges are subject to harmless error review and explaining, "[w]e will

49

not reverse a defendant's conviction based on a challenge to the jury charge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." (internal quotation marks omitted)). As developed in detail above, the evidence of Ware's guilt was overwhelming, so any abuse of discretion by the district court when it gave this flight instruction did not affect Ware's substantial rights or provide grounds for reversal.

Turning to the content of the instruction, which Ware now challenges, the district court here gave the Eleventh Circuit's pattern special instruction, S19:

> Intentional flight or concealment by a person during or immediately after a crime has been committed or after he is accused of a crime is not of course sufficient in itself to establish the guilt of that person, but intentional flight or concealment under those circumstances is a fact which, if proved, may be considered by the jury in light of all of the other evidence in the case in determining the guilt or innocence of that person. Whether or not the defendant's conduct constituted flight or concealment is exclusively for you as the jury to determine. And if you do so determine, whether or not that flight or concealment showed a consciousness of guilt on his part and the significance to be attached to that evidence are also matters exclusively for you as a jury to determine. I remind you that in your consideration of any evidence of flight or concealment, if you should find that there was flight or concealment you should also consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to

confront the police, or reluctance to confront the witness. And
may I also suggest to you that a feeling of guilt does not
necessarily reflect actual guilt of a crime to which you may be
considering.

(Doc. 297 at 653-54.)

At trial, Ware objected only that there was not "sufficient evidence
to support instructing the jury on evidence of flight." (Doc. 297 at
589.) But Ware now argues an additional point, asserting that any
flight instruction should have "told the jury that it had to find that
[Ware] fled because of the instant charges *beyond a reasonable doubt*."
(Appellant's Br. at 38.) In support of this proposition, Ware cites
*Williams*, 541 F.3d at 1089. But although the *Williams* Court approved
a flight instruction that contained the "beyond a reasonable doubt"
language, it did not suggest such language was necessary. *See id.* And
Ware ignores this Court's many other cases that have approved of
flight instructions that did not include such language and were nearly
identical to the pattern instruction given by the district court here.
*See, e.g.*, *Borders*, 693 F.2d at 1327-28; *see also United States v. Stewart*,
579 F.2d 356, 359 & n.3 (5th Cir. 1978) (upholding a limiting
instruction that closely parallels the current Eleventh Pattern
Instruction on evidence of flight).

Moreover, because Ware did not raise this specific objection to the
flight instruction by asking the district court to add the "beyond a

51

reasonable doubt" language, this Court reviews only for plain error.
Rule 30(d) of the Federal Rules of Criminal Procedure makes clear
that:

> A party who objects to any portion of the instructions or to a
> failure to give a requested instruction must inform the court of
> the specific objection and the grounds for the objection before
> the jury retires to deliberate.  An opportunity must be given to
> object out of the jury's hearing and, on request, out of the jury's
> presence.  Failure to object in accordance with this rule
> precludes appellate review, except as permitted under Rule
> 52(b) [*i.e.*, for plain error].

Fed. R. Crim. P. 30(d); *see also United States v. Solomon*, 856 F.2d 1572,
1577-78 (11th Cir. 1988) (reviewing omission of an "unrequested
instruction" only for plain error); *United States v. Meester*, 762 F.2d
867, 879-80 (11th Cir. 1985) (same). Under the plain error standard,
an appellant must show that: (1) an error occurred; (2) the error was
plain; (3) it affected his substantial rights; and (4) it seriously affected
the fairness of the judicial proceedings. *United States v. Pena*, 684 F.3d
1137, 1151 (11th Cir. 2012).

As discussed above, the district court's instruction was proper,
so no error occurred, much less a plain error. But even assuming
arguendo that the court plainly erred, Ware cannot show that the
court's failure to add this unrequested language to a pattern jury
instruction affected his substantial rights or seriously affected the

fairness of the judicial proceedings. "Under the third prong of the plain error analysis, the defendant bears the burden of persuasion and must show that the claimed error affected his substantial rights, which almost always requires that the error must have affected the outcome of the district court proceedings." *Id.* And the purpose of the fourth prong "is to analyze whether a reasonable citizen would bear a rightly diminished view of the judicial process and its integrity if the court refused to correct the alleged error." *Hawkins*, 934 F.3d at 1268 ("In analyzing this element, the United States Supreme Court has often rested its determination on the amount of evidence incriminating the defendant, regardless of the error."). In light of the overwhelming evidence of Ware's guilt detailed above, Ware cannot demonstrate that the jury's hearing the pattern instruction on evidence of flight affected the outcome of the district court proceedings, much less that it would diminish the integrity of the judicial process if not reversed.

**4. The District Court Did Not Err by Concluding that Victims Were Physically Restrained to Facilitate the Robberies at Lush Nails, Royal Massage, and BD Spa and Wellness Massage.**

In calculating Ware's guidelines, the district court included the 2-level enhancement that applies when a person is "physically restrained to facilitate commission of the offense or to facilitate escape." (Doc. 299 at 4-5; Doc. 277 at 6-9; U.S.S.G. § 2B3.1(b)(4)(B)). Relevant to this appeal, the court applied the enhancement to three robberies in

53

which the robbers threatened victims at gunpoint and forced victims to the floor or to back areas of the businesses. (Doc. 299 at 4-5.) The guidelines commentary defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." *See* § 3B3.1 cmt. 1; § 1B1.1 cmt. 1(K). But this Court has "made clear, however, that the enhancement is not limited to those examples it provides, but also applies when the defendant's conduct ensured the victims' compliance and effectively prevented them from leaving a location." *United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013) (internal quotation marks omitted); *see also United States v. Jones*, 32 F.3d 1512, 1518-19 (11th Cir. 1994); *cf. United States v. Whatley*, 719 F.3d 1206, 1221-22 (11th Cir. 2013) (noting that moving victims around an establishment during a robbery did not justify the 4-level "abduction" enhancement, but did justify the 2-level "physical restraint" enhancement).

In *Victor*, the defendant robbed a bank while holding his hand in his pocket as if concealing a firearm. 719 F.3d at 1289. During the robbery, he pointed the apparent gun at an employee in the lobby, directed her toward the teller line, and yelled that he had a gun and would kill anyone that did not comply with his commands. *Id.* The employee froze with fear beside him. *Id.* This Court held that "by threatening the lobby employee with what the employee believed to be

54

a gun to prevent her from escaping, Victor physically restrained her within the guidelines' meaning." *Id.* at 1290. The Court further noted that it did not matter that the defendant was not actually armed or that the victim did not move at all. *Id.*

In *Jones*, the defendants brandished firearms, ordered the employees into the safe at the end of the robbery, closed the door, and left. 32 F.3d at 1514-15. This Court upheld application of the 2-level "physical restraint" enhancement because the defendants "restricted their victims' mobility and capacity to observe events to facilitate the robbery." *Id.* at 1519. The Court further explained that even though no threats were made, "the obvious presence of handguns ensured the victims' compliance and effectively prevented them from leaving the room for a brief period of time while the robbers fled the scene." *Id.*

Here, much like the defendants in *Victor* and *Jones*, Ware and Smith threatened the victims with handguns to prevent the victims from escaping. While this alone might be enough to support applying the restraint enhancement, Ware and Smith physically restrained their victims in additional ways in each of the three robberies at issue. Specifically:

- In the Lush Nails robbery, the robbers assaulted and threatened victims at gunpoint and forced one to the floor while also yelling, "Don't move," and, "I will fucking kill

you bitch. I will fucking kill you. Are you on the phone?"
(Doc. 295 at 225.)

- In the Royal Massage robbery, Smith physically put his arm around one victim's neck and moved her at gunpoint behind a counter, Ware knocked another victim to the floor at gunpoint, and Smith and Ware together forced both victims to the back of the business at gunpoint before fleeing. (Gov't Ex. 113.)

- Finally, in the BD Spa robbery, Ware forced one victim at gunpoint to the back of the business and shoved her to the floor before cornering another victim in a back room. (Gov't Ex. 128.)

Accordingly, the district court correctly applied the 2-level enhancement under § 2B3.1(b)(4)(B) for each of these three robberies, because a person was physically restrained to facilitate commission of the offense or to facilitate escape.

In addition, this Court should reject Ware's invitation to adopt the five-factor test that the Third Circuit articulated in *United States v. Bell*, 947 F.3d 49, 54-62 (3d Cir. 2020), which would require this Court to ignore *Victor* and *Jones*, which are binding precedent in this Circuit. (*See* Appellant's Br. at 42.) In *Bell*, the Third Circuit found that the defendant did not physically restrain the victim when he

pointed what appeared to be a firearm at the victim, grabbed him by the neck, and forced him to the floor. *Bell*, 947 at 61. The *Bell* court noted that after being thrown to the floor, the victim attempted to stop the robbery by grabbing the defendant's arm. *Id.* at 53. The defendant then struck the victim with the weapon, at which point it broke and the victim realized it was a fake firearm made of plastic. *Id.* The victim then stood up and struggled with the defendant until the defendant pushed him away and fled the store. *Id.*

Key to the *Bell* court's decision that the victim was not restrained were two factors: (1) after being shoved to the floor, the victim continued resisting, and (2) the physical restraint of shoving the victim to the floor took only a few seconds before the victim stood back up. *Id.* at 61. But here, none of the victims in these three robberies fought back or in any way resisted. And even though the robberies themselves were brief, the restraint of the victims was not a fleeting matter within the robbery. Rather, other than one victim at BD Spa who managed to escape out the back door when Ware cornered a different victim in a room, the victims in all three of these robberies were restrained for the entire duration that Smith and Ware were in the businesses.

This Court should apply *Victor* and *Jones*, which compel a finding that Smith and Ware physically restrained the victims at Lush

Nails, Royal Massage, and BD Spa to facilitate commission of the robberies and the defendants' escape.

## CONCLUSION

The district court did not abuse its discretion in admitting expert fingerprint testimony, in admitting lay opinion identification testimony, or in charging the jury concerning flight/concealment, and if the court did error, such error was harmless. In addition, the district court properly calculated Ware's guideline range. Accordingly, the United States respectfully requests that this Court affirm Ware's conviction and sentence.

Respectfully submitted,

KURT R. ERSKINE
   *United States Attorney*

*/s/ Bret R. Hobson*
BRET R. HOBSON
   *Assistant United States Attorney*

58

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word processing software in 14-point Goudy Old Style.

This brief complies with the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word processing software, it contains 12,774 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Today, this brief was uploaded to the Court's website using the CM/ECF system, which automatically sends notification to the parties and counsel of record:

> Leigh Ann Webster, Esq.
> Strickland Webster, LLC
> 830 Glenwood Ave SE
> Suite 510-203
> Atlanta, GA 30316

April 4, 2022

> /s/Bret R. Hobson
> _____
> Bret R. Hobson
> *Assistant United States Attorney*

59