[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10539

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DRAVION SANCHEZ WARE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cr-00447-TCB-JSA-2

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

A jury convicted Dravion Sanchez Ware of thirteen counts of Hobbs Act robbery and associated firearm offenses for his involvement in robbing nine establishments in the greater Atlanta area from October 7, 2017 to November 10, 2017: three spas, four massage parlors, a nail salon, and a restaurant. He was sentenced to life in prison. On appeal, Ware presents three challenges to his conviction and one to his sentence: that the District Court erred (1) by not holding a formal *Daubert* hearing before admitting expert fingerprint evidence; (2) by admitting lay identification testimony by two FBI case agents who met with Ware upon his arrest; (3) by instructing the jury on flight and concealment; and (4) by applying the bodily restraint sentencing enhancement to three of the nine robberies. After carefully reviewing the record and with the benefit of oral argument, we find Ware's contentions unpersuasive and therefore affirm both his convictions and sentence.

## I.

Although Ware's appeal focuses on three discrete issues at his trial—and one at his sentencing hearing—we must begin by placing these challenges in context. Before discussing Ware's legal arguments, this opinion (1) illustrates the events of October 7, 2017 through November 10, 2017 as presented to the jury; (2) addresses the relevant pre-trial proceedings; and (3) summarizes the relevant evidence presented at trial.

*A.*

1.

At around 1:12 am on October 7, 2017, three men entered Spring Spa in Atlanta.  When one of the spa's employees saw that one of the men—a young, black man—had a pistol, she ran out a side door, flagged down a taxi, and used the driver's phone to dial 911.  While on the phone, the employee saw the man with the pistol and his two compatriots exit the spa and depart the area in a dark red vehicle.  The men had stolen that employee's cell phone.

2.

A little after 10:00 pm, four evenings later—that is, October 10—two black men visited Cedar Massage in Atlanta.  One wore a red jacket and hat and the other wore a sweatshirt with the hood up.  The pair looked around the store lobby, then inquired about the price of a massage.  The hooded man also took a mint or candy out of a heart-shaped dish on the welcome counter, put the mint in his mouth, removed the wrapper from his mouth, and replaced that wrapper into the bowl.  The behatted robber quickly revealed a handgun, holding it in his left hand.  The left-handed robber shoved his gun in two of the employees' faces, demanding all the money, and forcing them into a corner behind the massage parlor's welcome counter.  This allowed the left-handed robber to open the cash drawer before leading the employees out from behind the counter and to the back of the establishment at gunpoint.  Immediately prior to leaving, both robbers rummaged behind the counter one more time.  In less than five minutes, the

two had left Cedar Massage with wallets and cell phones from some employees as well as around $100 in cash.

3.

Late Friday night—around 11:15 pm on October 13—three days after the Cedar Massage robbery, a dark red sedan pulled into the parking lot of Qi Clay Sauna in Doraville.  Eventually, two young black men, one wearing a beanie and the other wearing a sweatshirt with a hood, exited the vehicle and entered the sauna.

Inside, the sauna's owner and the acting manager respectively stood and sat behind the welcome counter.  The two young, black men, as potential customers, asked the acting manager for a massage therapist.  The acting manager responded in the negative, informing the guests that Qi Clay does not offer massages.  About twenty seconds after entering the lobby, the duo revealed pistols, the robber in the beanie holding his in his left hand, and the robber in the hood holding his in his right hand.  The right-handed robber forced his way behind the welcome counter, stuck his gun in the acting manager's face, and threatened to kill him.  The acting manager put his hands up and said there was no money, at which point the right-handed robber began pistol whipping him in the head multiple times.  At some point during this assault, the magazine fell out of the pistol and was later recovered by police.  While the acting manager cowered on the ground, backed into a corner behind the welcome counter, the right-handed robber continued to point his firearm at the acting manager's head multiple times.  The right-handed robber also

emptied the cash drawer.  The left-handed robber grabbed the owner's purse off a chair; she tried to stop him, but the robber pushed and kicked her to regain control over the bag.

Roughly two minutes after they entered, the two robbers left the store, with the owner following behind them and the acting manager behind her.  Before getting back in the dark red car, one of the robbers fired shots in the air and shouted, "don't follow me."  The two robbers stole a little over $100 from the cash drawer as well as the owner's purse, which contained $996, the owner's phones, personal ID's, house key, and store keys to Qi Clay and other stores.

4.

One week later, on the evening of October 20, two black men burst into Lush Nails & Spa in Buckhead, guns drawn. When the robbers arrived, a customer was in the process of checking out at the front desk, and there was one other customer in the store.  One of the robbers put a gun to the side of the head of the customer who was checking out and said, "Nobody moves."  They walked around to the other side of the counter and hit an employee over the head to steal what was in the cash drawer; they also robbed the staff and kicked a woman in the face. One of the robbers also hit the customer who was checking out in the back of the head with his gun, causing her to smash her face on the tile floor.  As they were robbing the business, one of the robbers apparently thought this customer—who was by this time on the ground—had called someone, because he asked if she was

on the phone, kicked her, and threatened to kill her.  The robbers left with the customer's purse (containing jewelry, cash, makeup, and car keys) as well as what they took from the cash drawer and the employees.

5.

On October 24—four days after the Lush Nails & Spa robbery—two men exited a karaoke bar in Doraville and drove away in a dark red sedan in the direction of the Kochi Maru restaurant, which is one-half mile away.  Within half an hour, around 11:30 pm, two black men dressed the same as those that left the karaoke bar entered Kochi Maru.  Relevantly, one wore a beanie, and the other wore a sweatshirt with the hood up.

The man wearing the beanie picked up a menu and held up a "2" with his fingers to a waitress.  To the right of the front counter a group of seven women ate together; they would later be joined for a toast by the waitress who welcomed the two men. The hooded man then walked down a walkway to the restroom—returning after only a few seconds—while the man wearing the beanie picked up the owner's bag from a table situated along the same walkway.  The robber with the beanie then asked the owner where "the massage girls" were.  Needless to say, this restaurant did not offer massages.

The two men followed the owner back to the front desk, at which point the twosome revealed weapons, the hooded robber holding his gun in his right hand and the robber with the beanie holding his in his left.  The right-handed robber jammed his gun

in the owner's face.  The robbers then split up.  The hooded rob-ber threatened the table of female customers, shot one of them in the leg while she was sitting, and stole her bag.  He also shot an-other woman at the table twice: once through the leg and once on the left side of her calf.

Meanwhile, the left-handed robber grabbed the owner and forced her behind the front counter at gunpoint.  He grabbed the cash drawer, then walked around the counter, continuing to point his weapon at the owner, who faced the corner crouched down and covering her face.  The hooded robber came back from the table of former merrymakers, stopped for a detour while his part-ner stood on the outside of the counter close to the door, and shot the cowering owner in the back at close range before turning and leaving with the left-handed robber.  By the time they left, the robbers had been in the restaurant for less than five minutes, and the robbery itself lasted less than one minute.

6.

Ten days later, at around 6:00 pm on November 3, two young, black men—again, one wearing a beanie and another in a hooded sweatshirt—walked into Royal Massage in Norcross.  The two robbers entered the business and asked for a massage, at which point an employee welcomed them and told them to fol-low her.  Once again, the hooded man appeared to pick up a mint or candy from a dish on the welcome counter.

The pair then pulled out guns and demanded money; again, the hooded robber held his gun in the right hand and the

robber wearing the beanie held his gun in the left hand. The left-handed robber immediately grabbed the welcoming employee around the neck and brought her around the front counter and then to the back of the store. When the left-handed robber released the employee for a moment, she escaped through a back door. Meanwhile, the right-handed robber forced the owner to the ground, and then to the back of the store. After about two minutes, the robbers left with about $2,000 in cash; a cellphone, driver's license, and wallet from the welcoming employee; and a purse from the owner of the business. After leaving the store, the robbers drove away in a dark red sedan with a temporary license plate.

7.

Around 8:00 pm on November 8, five days after the Royal Massage robbery, the front desk manager, two employees, and a customer were in Empress Massage II in Duluth. A dark red car pulled into the parking lot before two black men exited the vehicle and entered the lobby, both sporting hooded sweatshirts with the hoods up. The manager, who was standing, asked if these new customers wanted massages, and called other employees over. One robber sat down near the customer who was sitting in the waiting area. The manager then left the store. At this point, the two hooded newcomers drew firearms, one man holding his gun in his left hand, the other holding his in his right hand. The employees scattered. The right-handed robber pursued one around a divider, then pointed his weapon at other people down a

hallway leading to the back of the store. Meanwhile, the left-handed robber shoved his gun in the customer's face, took her bag, and rummaged behind the front counter. After a little over one minute, the robbers had left with around $600 or $700 from the store itself.

8.

Later that evening, at 8:40 pm, two black men, one wearing a beanie and a hooded sweatshirt, the other wearing a hood over his head, entered BD Spa in Stone Mountain. The hooded man took a candy or mint out of a candy dish. After a few seconds, an employee of the spa came out of a room in the back of the business to greet the two newcomers in the lobby. The hooded man drew a handgun and held it with his right hand.

The robber with the beanie then dug around behind the front counter while the hooded robber forced the employee back down the same hall from which she entered the lobby at gunpoint. He pushed her to the floor and entered the room the employee had exited a minute or so earlier, which contained a customer. While he searched the room, the employee escaped out a back door. The two robbers left the spa after less than two minutes, and a red car drove out of the parking lot seconds after they vacated the building.

9.

On November 10—two days later—around 8:50 pm, three tall, thin, young, black men entered New You Massage in Roswell. When they arrived, the owner of the business was per-

forming a pedicure while the manager and three customers were in or near the lobby. The manager walked over to the front counter and the three men asked for a massage, at which point the men moved to the waiting area. All three men pulled out guns, with two hooded robbers holding the weapons in their right hands and a beanie-clad robber holding his in his left hand.

One of the robbers pressed his gun to the owner's temple and demanded money. The left-handed robber rummaged behind the front counter, pointing his weapon repeatedly at the manager; after which the robber forced the manager out from behind the counter and along the ground at gunpoint. In the meantime, the right-handed robbers had gone towards the back of the establishment. While in the back, one of the robbers forced an employee to the ground at gun point. The robbers attempted to take some bags from the back of the store and smashed the butt of a gun on a woman's head to do so. The robbers soon left with $1,100, an overcoat, a cell phone, and a wallet. The owner was able to track her stolen cell phone to a median on Georgia 400, where the police ultimately recovered the phone.

*B.*

FBI agents arrested Tabyron Smith on November 21, 2017, and Dravion Ware on November 22, both pursuant to a warrant. When the agents arrested Smith, they found clothing consistent with that worn by the left-handed robber in the previously described robberies, and they believed Smith was the left-handed robber. When agents arrested Ware, he was hiding under a bed

in the upstairs bedroom of an apartment.  A cellphone was also found under this bed, and a pistol was concealed under the mattress.  Agents found clothing consistent with that worn by the right-handed robber, and they believed Ware was the right-handed robber.

A grand jury in the United States District Court for the Northern District of Georgia indicted[1] Ware and Smith on thirteen counts related to the armed robberies discussed above.

Count One alleged that Ware conspired with co-defendant Tabyron Rashad Smith[2] and at least one other unknown person to affect interstate commerce by means of robbery in violation of the Hobbs Act, 18 U.S.C. § 1951(a), by robbing nine businesses in the Atlanta area between October 7, 2017 and November 10, 2017.

Counts Two (Cedar Massage), Four (Qi Clay Sauna), Six (Kochi Maru), Eight (Empress Massage II), and Ten (New You Massage) alleged that Ware aided and abetted Smith—and vice versa—to affect interstate commerce by means of robbery in vio-

---

[1] The counts that follow are taken from the operative indictment at trial—the Third Superseding Indictment, which was filed on July 16, 2019.

[2] Smith pleaded guilty pursuant to an agreement in open court on July 23, 2019—less than a week before Ware's trial—to the conspiracy count as well as four of the firearms counts.

lation of the Hobbs Act, 18 U.S.C. § 1951(a).[3] *See id.* § 2 (holding those who aid and abet the commission of an offense liable as principals).

Counts Three (Cedar Massage), Nine (Empress Massage II), and Eleven (New You Massage) alleged that Ware and Smith[4] brandished a firearm during the crimes of violence alleged respectively in Counts Two, Eight, and Ten in violation of 18 U.S.C. §§ 924(c)(1)(A) & (c)(1)(A)(ii). *See id.* § 2.

Counts Five (Qi Clay Sauna) and Seven (Kochi Maru) alleged that Ware and Smith discharged a firearm during the crimes of violence alleged respectively in Counts Four and Six in violation of 18 U.S.C. §§ 924(c)(1)(A) & (c)(1)(A)(iii). *See id.* § 2.[5]

With the advice of counsel, Ware pleaded not guilty to all thirteen counts with which he was charged.

Prior to trial, the District Court heard arguments and motions on a number of evidentiary issues. For one, Ware moved to adopt Smith's motion in limine to preclude fingerprint evidence. Smith's motion relied on the 2009 United States National Re-

---

[3] Count Eight alleged that a third person engaged in the Empress Massage II robbery, and Count Ten alleged that two additional individuals engaged in the New You Massage robbery.

[4] And the additional individuals involved in the Empress Massage II and New You Massage robberies.

[5] Ware was also charged, but ultimately not tried, on two firearm possession charges.

source Counsel ("NRC") report and subsequent 2016 President's Counsel of Advisors on Science and Technology ("PCAST") report, which supposedly revealed a dearth of "proper scientific studies of fingerprint comparison evidence" and claimed that "there is no scientific basis for concluding a fingerprint was left by a specific person," positing that "because fingerprint analysis involves individual human judgement, the resulting [fingerprint comparison] conclusion can be influenced by cognitive bias." Def. Smith's Mot. To Preclude Fingerprint Evid. The District Court conditionally denied the motion at the pre-trial hearing unless Ware's counsel could produce before trial a case from this Court or a district court in this Circuit that favors excluding fingerprint expert evidence under *Daubert*.[6]

Ware also moved in limine to exclude "any purported identification testimony based on a photograph or video." The magistrate judge recommended that this motion be denied because Special Agents Winn and Costa, who respectively spent one hour and four hours with Ware after his arrest twelve days after the last of the robberies—which was two years before trial—could provide helpful lay identification testimony to the jury. The District Court denied Ware's motion at the pre-trial hearing.

*C.*

Ware's trial lasted four days and began on July 29, 2019. On day two of the trial, the Government called a former Sandy

---

[6] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

Springs crime scene investigator who pulled a latent fingerprint off of the New You Massage owner's cell phone. He testified about the process of creating a fingerprint card, and defense counsel vigorously cross-examined him about the usefulness of a latent fingerprint in making an identification.

The same day, the Government called FBI Special Agent Winn, who was the lead case agent for these robberies. Agent Winn explained the data contained on a cellphone found with Ware upon his arrest, including text messages apparently addressed to Ware and selfies of Ware.

At this point, Agent Winn identified Ware on direct examination:

> A.    . . . There was also pictures and videos on the phone with some of them being what you would call selfies or appeared to be pictures taken by the person holding the phone, and those pictures depicted, and videos, depicted Mr. Ware.
>
> Q.    And have you spent time with Mr. Ware since his arrest?
>
> A.    Yes.
>
> Q.    So you have a basis to recognize him?
>
> A.    Yes.

Agent Winn discussed another photo on the phone:

> Q.    Is that a full-size version of that picture?
>
> A.    Yes.

Q.    And is that -- do you recognize that?

A.    Yes.  That's Dravion Ware.

Agent Winn identified Ware from a third photo:

Q.    And do you recognize that person?

A.    Yes.

Q.    Who is it?

A.    Dravion [W]are.

Agent Winn also identified tattoos from pictures of Ware as being consistent with tattoos visible on the right-handed robber in the Qi Clay Sauna robbery surveillance video.

On day three of the trial, the Government called FBI Special Agent Costa, who served as the co-case agent alongside Agent Winn.   The prosecutor and Agent Costa engaged in this exchange:

Q.    Did you participate in the arrest of Mr. Ware on November 22, 2017?

A.    I did.

Q.    How long after the last robbery at New You Massage was that arrest?

A.    Approximately 12 days.

Q.    And approximately how long after the first robbery back on October 7th at Spring Spa?

A.    Approximately a month and a half.

Q.      Did you interview Mr. Ware on the day of his arrest?

A.      I did.

. . .

Q.      How long approximately did you spend with Mr. Ware during the interview process?

A.      Approximately an hour and a half to two hours.

Q.      Did you spend some more time with him after that, before you turned him over to someone else?

A.      Yes.  Both before and after.

Q.      Approximately how much time total do you think you spent with him?

A.      A minimum of four hours.

Q.      Possibly more?

A.      Possibly more.

Q.      Do you recognize the person you arrested here in the courtroom?

A.      I do.

Q.      Can you please describe an item of clothing he is wearing and point him out?

A.      He is wearing a white dress shirt and a striped tie sitting at the defense table over there.

Q.     That is the same Mr. Ware you arrested on November 22nd of 2017?

A.     It is.

Q.     Has his appearance changed at all since then?

A.     Yes.  His hair is longer.  And when I spent time with him it wasn't obscuring his face, it was shorter.  And looks like he has just gotten a little bit older and maybe put on a little bit of weight.

Q.     During the course of your investigation, did you review the video footage carefully?

A.     I did.

Q.     Did you view it repeatedly?

A.     Yes.

Q.     Did you slow it down and pause it?

A.     Yes.

Q.     Are there a few spots in particular where you believe you can identify Mr. Ware with some level of certainty from the videos based on the time you spent with him shortly after the robberies?

A.     Yes.

At this point, defense counsel objected under Federal Rules of Evidence 701 and 702, renewing the pre-trial objections.[7]  The

_____

[7] Federal Rule of Evidence 701 states:

District Court overruled the objections and the examination continued:

> Q.    Which video in particular?
>
> A.    The New You Foot Massage on November 10.
>
> . . .
>
> Q.    Was there a spot in the BD Spa video where you felt you could identify him?
>
> A.    There was.
>
> . . .
>
> Q.    How about at Qi Clay Sauna?  Was there a spot in the video there where you thought you could recognize him?
>
> A.    Yes, there was.

---

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

. . .

Q.    Is there something else about that picture -- first, before I get to that, while you spent time with Mr. Ware, did you see his tattoos?

A.    I did.

Q.    Did you have time to observe them over the hours that you spent with him?

A.    Yes, I did.

Q.    Based on that do you feel you can recognize those tattoos in this video?

A.    Yes, I do.

Q.    Where are they?

A.    The one that stands out to me is on his left wrist into his forearm.

Q.    And for the jury's benefit, does this picture from Mr. Ware's phone, that we have already admitted, clearly show the arm tattoo that we are talking about . . . ?

A.    Yes, it does.  It's a flame on his left forearm.

Q.    Was there a spot in the Royal Massage video where you thought you could recognize Mr. Ware?

A.    Yes, there was.

. . .

Q.    How about in the Kochi Maru video?

A.     Yes.  In that one as well.

After each question about the surveillance videos, Agent Costa identified the specific point in the video in which he could recognize Ware.

Later that day, the Government called a crime lab scientist with the Georgia Bureau of Investigation Division of Forensic Sciences.  The Government tendered the scientist as an expert in fingerprint examinations and comparisons.  This expert outlined the science behind fingerprints themselves, including their uniqueness.  According to the expert, as a person "handle[s] an object or touch[es] a surface, the sweat and other residues on the surface of the skin can be transferred to the surface of the object [in the pattern of the person's fingerprint], and then later developed and collected and preserved to be used for comparison against other known fingerprint exemplars."

The expert also explained the four-step process the lab follows in analyzing a fingerprint once it has been recovered: "Analysis, Comparison, Evaluation, and Verification," or ACEV.  First, the examiner "examine[s] and observe[s] any friction ridge impression or latent[8] print from the evidence to determine if there is enough detail of suitable quality that the impression can be com-

---

[8] The expert explained that a latent print is a fingerprint or partial fingerprint left behind on an object that would be collected by a crime scene examiner.

pared to a known print."[9]  In other words, the first step is to determine if there is enough of a print to even engage in a comparison.  Second, the examiner places the latent and known print side by side and "look[s] for either the similarity or dissimilarity in those features in the latent and the known" prints.  Then, the "evaluation phase is . . . where the examiner makes a decision of whether or not the latent prints and the known prints were made by the same source or different sources."  The examiner can reach one of three conclusions after this process: (1) identification, meaning the examiner thinks the prints were made by the same person; (2) exclusion, meaning the examiner thinks the prints were made by different people; or (3) an inconclusive result, meaning the examiner cannot determine whether the prints were made by the same person or not.  The verification process involves another examiner completing the whole process a second time.

The fingerprint expert testified that she was the verifying examiner for the print retrieved from the New You Massage owner's cell phone found on the Georgia 400 median.  She testified that the lab concluded the latent print found on the cell phone led to an identification conclusion matched to Ware's left middle finger.  Defense counsel specifically asked about the PCAST report it sought to use to exclude the fingerprint testimony prior to trial.  Ware's attorney vigorously cross-examined the

---

[9] The expert also explained that a known print is the comparison fingerprint taken from a known individual in a controlled setting, like at a police station.

expert, discussing the possibility of a latent fingerprint not being usable due to smudging or a finger only lightly touching an object, the subjectiveness of every step of the four-part fingerprint analysis, and the bias that may creep into the verification process after another examiner has already reached an identification conclusion. The expert and defense counsel discussed fingerprint comparison as a forensic discipline, including the potential for false positives and negatives. On cross, the defense also attacked the expert's claim that she did not know of the Georgia Bureau of Investigation ever misidentifying someone with a fingerprint comparison, and that she did not know the rate at which a verifier disagrees with the original assessment.

At the end of this day of trial, the parties read two stipulations to the jury. The first stated that Ware and Smith had known each other since at least 2012. The second informed the jury that investigators tested the gun found under the mattress with Ware during his arrest and it did not match the ballistics testing for the shooting at Kochi Maru. At the end of this day, the Government rested and defense counsel moved for a judgment of acquittal.

On the last day of trial, before the presentation of Ware's two witnesses later that day—a private investigator and an officer who responded to the BD Spa robbery—Ware objected to the inclusion of a jury instruction on flight and concealment.[10] In ex-

---

[10] The jury instruction read:

> Intentional flight or concealment by a person during or immediately after a crime has been committed or after he is ac-

plaining the objection, defense counsel specifically recognized that "this is not the law from the 11th Circuit, but . . . there is some law from other courts, including the Georgia Supreme Court, saying instructions on flight are inappropriate because they draw unnecessary attention to it."  The District Court overruled the objection.  The jury returned a guilty verdict on all counts the next day.

The District Court sentenced Ware on February 9, 2021.  Relevant to this appeal, the Court found that a two-level sentencing enhancement for physically restraining victims applied to all the robberies but the Spring Spa robbery.  *See* U.S.S.G.

---

cused of a crime is not of course sufficient in itself to establish the guilt of that person, but intentional flight or concealment under those circumstances is a fact which, if proved, may be considered by the jury in light of all of the other evidence in the case in determining the guilt or innocence of that person. Whether or not the defendant's conduct constituted flight or concealment is exclusively for you as the jury to determine. And if you do so determine whether or not that flight or concealment showed a consciousness of guilt on his part and the significance to be attached to that evidence are also matters exclusively for you as a jury to determine.  I remind you that in your consideration of any evidence of flight or concealment, if you should find that there was flight or concealment you should also consider that there may be reasons for this which are fully consistent with innocence.  These may include fear of being apprehended, unwillingness to confront the police, or reluctance to confront the witness.  And may I also suggest to you that a feeling of guilt does not necessarily reflect actual guilt of a crime to which you may be considering.

§ 2B3.1(b)(4)(B).  Under the calculation of the presentence investigation report (the "PSR"), each of the robberies merited a guideline sentence of 235 to 293 months, but the Hobbs Act robbery offense carried a statutory maximum of 240 months.  Additionally, the District Court added a mandatory 252 months for three counts of brandishing a firearm and a mandatory 240 months for two counts of discharging a firearm as it was required to do, thus bringing the guideline range sentence to 727 to 785 months.

The District Court, after hearing argument, also applied an upward departure pursuant to the commentary to U.S.S.G. § 2B3.1 for intending to murder the owner of Kochi Maru when Ware shot her in the back.[11]  This upward departure brought the guideline range to a mandatory 41 years for the firearm offenses, plus a range of 370 months to life imprisonment for the robberies. The District Court went on to sentence Ware to life in prison: 20 years concurrently on Counts 1, 2, 4, 6, 8, and 10; and life concurrently on Counts 3, 5, 7, 9, and 11.  Ware objected to the application of the two-level physical restraint adjustment.

In addition to the lay identification testimony and fingerprint evidence that tied Ware to these nine robberies, the Government introduced the following summarized evidence.  The prosecutor called eyewitnesses from almost every robbery—though defense counsel revealed that many could not identify the

---

[11] "If the defendant intended to murder the victim, an upward departure may be warranted; see § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder)."  U.S.S.G. § 2B3.1 cmt. n.5.

robbers beyond their race. Investigators explained modus operandi evidence applicable to most robberies that included the robbers' appearance, dress, hand dominance, and getaway vehicle. The Government introduced search pictures of the car believed to be the getaway car. It had been painted white, contained Korean currency and cigarette butts, and had a temporary vehicle tag in the glovebox. The Government showed surveillance footage from Qi Clay, Cedar Massage, Kochi Maru, Empress Massage, New You, BD Spa, and Royal Massage. Cell location data placed Smith or Ware near Spring Spa, Lush Nails & Spa, Royal Massage, Empress Massage, and New You Massage at about the time of the robberies of those respective businesses. The jury saw incriminating searches on the phone found with Ware upon his arrest. These included (1) addresses of the robbed businesses prior to the robberies; (2) searches for weapon sales coinciding with the right-handed robber losing his magazine at the Qi Clay robbery; and (3) "Channel 2 News most wanted," "Robbery crew arrested of terrorizing at least nine restaurants, businesses," "what kind of phones can be traced," and "Dravion Ware" after the FBI had released information to the press asking for assistance in concluding the robbery investigations. A DNA expert introduced DNA evidence with a confidence rate multiple times higher than the FBI's threshold for conclusively identifying a DNA's source. This evidence included matching Ware to the mint wrapper left at Cedar Massage and matching Smith and Ware to cigarette butts, a hat, and a water bottle in the car thought to be the getaway car.

## II.

"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (citations omitted). We also review the denial of a *Daubert* hearing only for abuse of discretion. *United States v. Hansen*, 262 F.3d 1217, 1233 (11th Cir. 2001) (per curiam).

"[D]eference . . . is the hallmark of abuse-of-discretion review." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S. Ct. 512, 517 (1997). Therefore, we must affirm an evidentiary decision of a district court "unless the ruling is manifestly erroneous," *id.* at 142, 118 S. Ct. at 517 (quoting *Cong. & Empire Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878)), that is, unless the district court "has made a clear error of judgment, or has applied the wrong legal standard." *Frazier*, 387 F.3d at 1259 (citation omitted).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on suf-
> ficient facts or data;
>
> (c) the testimony is the product
> of reliable principles and methods; and
>
> (d) the expert has reliably ap-
> plied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.

The district courts have a duty to ensure that the parties follow Rule 702, and thus that the jury only hears testimony given the imprimatur of being spoken by an expert, when the testimony is deserving of such a distinction. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–93, 113 S. Ct. 2786, 2795–97 (1993). In this Circuit, courts utilize a three-part test to screen potential expert evidence under Rule 702:

> Scientific expert testimony is admissible if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Hansen*, 262 F.3d at 1234 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

The burden of establishing these three prongs—qualification, reliability, and helpfulness—falls on the proponent of the expert opinion, here, the prosecution.  *Frazier*, 387 F.3d at 1260.  While the government bears this burden, and though we have described this three-part inquiry as "rigorous," *id.*, the United States Supreme Court unequivocally refers to the *Daubert* inquiry as "flexible."  *Daubert*, 509 U.S. at 594, 113 S. Ct. at 2797.

The flexibility of the *Daubert* analysis and the deferential review of district court decisions in this realm derive from the same general policy: allowing district courts, which are much more intimately familiar with the individual facts and needs of a particular case, to manage their dockets and counsels' time to provide the most efficient and just resolution of issues.  As the Supreme Court has explained, without this necessary leeway,

> the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  In reviewing these evidentiary issues under an abuse of discretion standard, we will not micromanage trial courts from the appellate bench.

Ware challenges neither the qualifications of the Government's fingerprint expert nor the helpfulness of the testimony; he

only challenges the reliability of fingerprint analysis generally. Within the reliability prong, district courts generally consider four factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (internal citation omitted). When a district court, in fulfilling its gatekeeping function, carefully considers these factors, it may hold a *Daubert* hearing. But "*Daubert* hearings are not required." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (quoting *Hansen*, 262 F.3d at 1234).

On the one hand, a *Daubert* hearing "may be helpful in 'complicated cases involving multiple expert witnesses.'" *Hansen*, 262 F.3d at 1234 (quoting *City of Tuscaloosa*, 158 F.3d at 564–65 n.21). And a "district court should conduct a *Daubert* inquiry when the opposing party's motion for a hearing is supported by conflicting medical literature and expert testimony." *Id.* (internal quotation marks and citation omitted). On the other hand, "some expert testimony will be so clearly admissible that a district court need not conduct a *Daubert* hearing in every case." *Frazier*, 387 F.3d at 1264.

Ware does not just challenge the reliability of fingerprint evidence; rather, he specifically asserts that the District Court erred by not holding a *Daubert* hearing to answer the reliability

question. However, such a hearing is not always required. *See Cook*, 402 F.3d at 1113. We grant "the same kind of latitude" to the district court "in deciding *how* to test an expert's reliability" as we grant to the district court's decision "*whether or not* that expert's relevant testimony is reliable." *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176 (emphasis in original).

The District Court here did not abuse its discretion in not holding a formal *Daubert* hearing before admitting the Government's fingerprint expert. "Notwithstanding its critical gatekeeping function" to prevent the jury from hearing expert testimony that does not have proper indicia of reliability, "the trial court is just that—a gatekeeper—and Rule 702 is a *screening* procedure, not an opportunity to substitute the trial court's judgment for that of a jury." *United States v. Barton*, 909 F.3d 1323, 1332 (11th Cir. 2018) (emphasis in original). The issue presented by Ware's objection in this case makes it all the more reasonable for the District Court to have denied the motion to exclude the Government's fingerprint expert without a formal hearing. Ware only challenges the reliability prong of *Daubert*. In other words, Ware only suggests that fingerprint comparison is unreliable science as a general matter, not that the Government's particular fingerprint expert was unqualified to testify about fingerprint comparison.

The *Daubert* gatekeeping function's core use is to keep junk science away from the jury. In fact, *Daubert* cases frequently express concern about trial judges substituting their judgment for that of the jury. *See, e.g., Barton*, 909 F.3d at 1332; *Quiet Tech.*, 326

F.3d at 1341 ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."); *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023) (rejecting a "categorical rule that the district court must never allow the jury to hear an expert's testimony before ruling on it").

Fingerprint comparison has long been accepted as a field worthy of expert opinions in this Circuit, as well as in almost every one of our sister circuits. *See United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005) (per curiam); *see also United States v. Straker*, 800 F.3d 570, 631 (D.C. Cir. 2015) (per curiam) ("The reliability of [ACE-V] fingerprint methodology was 'properly taken for granted.'" (quoting *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176)); *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006) (finding the ACE-V fingerprint method reliable and following other circuits); *United States v. Al-Farekh*, 956 F.3d 99, 115 (2d Cir. 2020) (assuming fingerprints reach the *Daubert* reliability threshold to hold the district court did not abuse its discretion by limiting defendant's cross examination of the government's fingerprint expert); *United States v. Mitchell*, 365 F.3d 215, 246 (3d Cir. 2004) (finding "good grounds" for admitting the government's fingerprint analysis expert evidence); *United States v. Crisp*, 324 F.3d 261, 269 (4th Cir. 2003) (affirming the district court's admission of a fingerprint expert); *United States v. John*, 597 F.3d 263, 274–75 (5th Cir. 2010), *abrogated on other grounds by Van Buren v. United States,* 141 S. Ct. 1648 (2021) (holding the district court did not err by not conducting a *Daubert* hearing on fingerprint reliability because

"the reliability of the technique has been tested in the adversarial system for over a century and has been routinely subject to peer review"); *United States v. Havvard*, 260 F.3d 597, 601 (7th Cir. 2001) (holding that a district court that recognized fingerprint analysis's "100 years of successful use in criminal trials" did not err by admitting fingerprint expert evidence); *United States v. Collins*, 340 F.3d 672, 682 (8th Cir. 2003) ("Fingerprint evidence and analysis is generally accepted."); *United States v. Calderon-Segura*, 512 F.3d 1104, 1110 (9th Cir. 2008) (stating that fingerprint identification "is just the sort of routine case where evidentiary reliability was properly taken for granted"); *United States v. Baines*, 573 F.3d 979, 992 (10th Cir. 2009) (holding the district court did not abuse its discretion by admitting fingerprint analysis evidence as reliable).

True, the PCAST and NCAST reports may cast doubt on the error rate of fingerprint analysis and comparison. But, as in many other realms of trial procedure, admissibility is a lower bar to clear than credibility. Much like the proper cure for incredible but admissible testimony is vigorous cross-examination, the proper cure for sufficiently reliable but allegedly "shaky" scientific evidence is not exclusion, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S. Ct. at 2798. Defense counsel put the Government's expert through his paces during cross-examination, and counsel specifically asked the expert about the findings in the PCAST report. The jury was therefore adequately cognizant of the potential limitations of fingerprint evidence. The District Court certainly did not abuse its discretion by

admitting evidence as oft used as fingerprint analysis. In fact, Ware's contrary authority even says that fingerprint evidence can be reliable. Appellant Br. at 25. The science could not possibly have been so unreliable as to be inadmissible.

Ware's brief claims that the District Court completely abdicated its gatekeeping role by admitting the fingerprint evidence. This is untrue. While the District Court did not conduct a formal *Daubert* hearing, it was not required to do so. The Court considered the reports and arguments presented and found that fingerprint evidence was reliable enough as a general matter to be presented to the jury. Many of the critiques of fingerprint evidence found in the PCAST report go to the *weight* that ought to be given fingerprint analysis, not to the legitimacy of the practice as a whole. Appellant Br. at 25 ("The studies collectively demonstrate that many examiners can, under *some* circumstances, produce correct answers at *some* level of accuracy." (emphasis in original)). Therefore, the evidence was properly admitted and properly interrogated on cross-examination.

Ware's brief also points to *Hansen* for the assertion that the District Court should have held a *Daubert* hearing because Ware's objection to the fingerprint evidence was supported by "conflicting medical literature and expert testimony." *Hansen*, 262 F.3d at 1234 (quotation omitted). As an initial matter, Ware did not offer a competing expert. More importantly, directly preceding this quote from *Hansen*, the Court acknowledges that "*Daubert* hearings are not required." *Id.* Additionally, the Court held in *Hansen*

that the District Court ultimately did not abuse its discretion in not holding a formal *Daubert* hearing. *Id.* The District Court here could have held a *Daubert* hearing to assess the relatively new reports Ware presented. But considering the long history in this Circuit and other circuits of admitting fingerprint experts without a *Daubert* inquiry, and the considerable leeway we grant to district courts on these matters, the District Court did not abuse its discretion by not holding a *Daubert* hearing here.

## III.

"We review the admission of witness testimony, both lay and expert, for abuse of discretion." *United States v. Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018) (citations omitted).

A quarter century ago, we joined many of our sister circuits in finding that "lay opinion identification testimony may be helpful to the jury where . . . 'there is some basis for concluding that the witness is more likely to correctly identify the defendant from [a] photograph [or video] than is the jury.'" *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998) (citation omitted). Determining the admissibility of lay opinion identification testimony involves placing the proffered testimony on a continuum.

On one end of the continuum, we find the identification testimony of the defendant's sister, college roommate, or ex-boyfriend—someone who has spent so much "substantial and sustained contact" with the defendant and has such an intimate relationship with the defendant that there is no doubt the witness brings a level of familiarity to the identification that a jury could

never hope to attain. *Id.*; *see also United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011) (allowing identification testimony using a surveillance photograph by the defendant's sister and ex-girlfriend); *United States v. Saniti*, 604 F.2d 603, 605 (9th Cir. 1979) (per curiam) (allowing identification testimony from the defendant's roommates). On the other end of the continuum, we find a witness whose "knowledge of the defendant's appearance [is] based entirely on the witness's 'review of photographs of [the defendant] and witnesses' descriptions of him.'" *Pierce*, 136 F.3d at 774 (second alteration in original) (quoting *United States v. LaPierre,* 998 F.2d 1460, 1465 (9th Cir. 1993)). The reason these latter witnesses ought to be excluded is because their identification is not based on "anything more than the evidence the jury would have before it at trial." *Id.*

To place a given lay identification witness on this continuum, a district court looks to:

> factors such as the witness's familiarity with the defendant's appearance at the time the surveillance photographs were taken or dressed in a manner similar to the individual depicted in the photographs, and whether the defendant had either disguised his appearance at the time of the offense or altered his appearance prior to trial.

*Id.* at 774–75. Because "we have not had the opportunity to articulate" where on this continuum admissible lay identification opinion becomes inadmissible and unhelpful to the jury, we once again look to our sister circuits for guidance to fill in the gaps left

by the *Pierce* standard. *United States v. Knowles*, 889 F.3d 1251, 1256 (11th Cir. 2018).

The Second Circuit, in considering a defendant's convictions for, in part, Hobbs Act robbery, held that the district court did not abuse its discretion in admitting lay identification testimony from the defendant's probation officer, who identified the defendant from a surveillance video of the robbery. *United States v. Walker*, 974 F.3d 193, 197, 204 (2d Cir. 2020). The probation officer had supervised the defendant for a year before the robbery and "had spent many hours" with him. *Id.* at 205. In reaching its conclusion, the court mentioned the fact that the robber wore a hood in the video, the defendant—unlike the robber in the video—wore glasses in the courtroom, the video was not clear, and the robber in the video looked heavier than the defendant in the courtroom. *Id.*

The Eighth Circuit, in a case involving a methamphetamine distribution ring, held the district court did not abuse its discretion in allowing a DEA agent to identify the defendants in a surveillance video of a controlled buy. *United States v. Sanchez*, 789 F.3d 827, 831, 837 (8th Cir. 2015). In so holding, the court reasoned that the testimony was helpful to the jury given the "relatively low quality of the footage and the agent's extensive surveillance of" the defendant.[12] *Id.*

---

[12] The surveillance took place over a period just shy of two years. *Sanchez*, 789 F.3d at 831, 833.

The Ninth Circuit, in a bank robbery case, held the district court did not abuse its discretion by admitting the identification testimony of the defendant's probation officer who had seen the defendant "four times in a two-month period, for a total of more than seventy minutes." *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005).

The Tenth Circuit, in another bank robbery case, held the district court did not abuse its discretion by admitting the identification testimony of the defendant's probation officer who had met with the defendant "for between five and ten minutes on multiple occasions." *United States v. Contreras*, 536 F.3d 1167, 1171 (10th Cir. 2008).

The Seventh Circuit held that the district court did not abuse its discretion in admitting the lay identification testimony of a witness who met the defendant (and only knew him by a nickname) once at a Christmas party a year before identifying him as a bank robber from a surveillance picture. *United States v. Jackson*, 688 F.2d 1121, 1122–23 (7th Cir. 1982). The court reasoned that her testimony was sufficiently useful "even without evidence of a change in the defendant's appearance." *Id.* at 1125.

The Sixth Circuit recently considered the lay identification of a bank robber by a victim teller. *United States v. Howell*, 17 F.4th 673, 678 (6th Cir. 2021). That court held that the district court abused its discretion in admitting the testimony because it was neither rationally based on the teller's perceptions nor helpful

to the jury.[13]  *Id.* at 684–85.  The teller could not see the robber during the robbery, but testified that his voice felt vaguely familiar.  *Id.* at 684.  Upon later watching news of the robbery and seeing that the defendant had been arrested for the crime, her suspicions were confirmed, and she pieced together who she believed the robber was.  *Id.* at 683–85.

Agents Winn and Costa had significantly more contact with Ware than the arms-length experience from the news at issue in *Howell*.  Both the one hour and four hours of contact place Agents Winn and Costa comfortably in an at least as helpful a place as the witnesses in *Jackson*, *Contreras*, and *Beck*.

Here, therefore, the District Court did not abuse its discretion in allowing Agents Winn and Costa to testify about Ware's identity.[14]  Both agents had first-hand knowledge of Ware's ap-

---

[13] Ultimately, the Sixth Circuit found the error harmless.  *Howell*, 17 F.4th at 686.

[14] Ware's attorney also objected to the following exchange between the prosecutor and a Doraville Police detective as an identification determination that ought to be left to the jury:

Q.    What are we watching there, Detective?

A.    Two males exiting a vehicle and going into a karaoke bar restaurant.

Q.    Is that the same vehicle that we were watching?

A.    Yes.

Q.    And have you actually been there to the restaurant they went -- or the karaoke bar they went to?

pearance outside the courtroom setting, as they had been with him when he was arrested. Combined, the two agents had contact with Ware for five hours—Agent Winn for one, and Agent Costa for four. This is greater familiarity than other circuit courts have required to produce admissible lay identification testimony. Additionally, and going to the first *Pierce* factor, both agents familiarized themselves with Ware less than two weeks after the last robbery. The jury, though also capable of comparing Ware in the courtroom with the photos found on the cellphone (as discussed by Agent Winn) and the robbery surveillance videos (as discussed by Agent Costa), was looking at Ware almost two years later.

As for the second of the two *Pierce* factors relevant here, whether intentionally or not, Ware "altered his appearance prior to trial." *Pierce*, 136 F.3d at 775. He had grown his hair out,

---

A.      Yes, sir, I have.

Q.      Could you tell what the occupants were wearing when they got out of the car?

A.      It appeared one was wearing the upper red area with possibly black pants, and the second one wearing all dark clothing.

The District Court overruled the objection, stating that the attorney could make his point on cross-examination. Assuming arguendo that (a) Ware has properly presented this officer's testimony to our Court by challenging the identification testimony of "law enforcement officers, including Agents Winn and Costa," Appellant Br. at 31, and (b) this particular exchange fails our *Pierce* analysis, this testimony was harmless. The detective's identification of the men's clothes constituted a mere drop in the, at the very least, bathtub of evidence the Government presented. *See infra* part I.C.

gained a little weight, and presumably looked two years older. Though the jury retained the ultimate duty to decide if the agents were credible and to analyze the surveillance footage and photographs themselves, Agents Winn and Costa added a level of familiarity contemporaneous to the charged offenses that the jury could not hope to attain. And that added familiarity consisted of much more than knowing the defendant outside of the "sterile courtroom setting." *Pierce*, 136 F.3d at 774 (citation omitted). Under these facts, we are confident that the agents' lay testimony fell on the admissible side of the continuum.[15] The District Court therefore did not abuse its discretion in admitting the agents' testimony.

## IV.

"We review a district court's jury instructions for an abuse of discretion." *United States v. Williams,* 541 F.3d 1087, 1089 (11th Cir. 2008) (per curiam) (citation omitted).

"Evidence of flight is admissible to demonstrate consciousness of guilt" from which a jury can infer actual guilt. *United States v. Blakey,* 960 F.2d 996, 1000 (11th Cir. 1992). Where prosecutors run into trouble in presenting evidence of flight to a jury is where the inferential chain between flight or concealment and

---

[15] It is worth noting that Agent Winn's testimony is a closer call than Agent Costa's. Agent Winn identified Ware in selfie pictures for the jury. Taking the Government's assertions—which were not challenged—as to how Ware's appearance changed between arrest and trial as true, however, Agent Winn still provided a helpful additional element to the jury.

consciousness of guilt is so attenuated to not be responsibly left to the jury for fear of prejudicing the defendant or drawing unnecessary attention to a likely meaningless act. "The cases in which flight evidence has been held inadmissible have contained particular facts which tend to detract from the probative value of such evidence." *United States v. Borders*, 693 F.2d 1318, 1325 (11th Cir. 1982). For instance, the probative value of flight evidence diminishes if the defendant "committed several unrelated crimes" or if "there has been a significant time delay between the commission of the crime"—or when the defendant discovered he was wanted for a crime—and the time of flight. *Williams*, 541 F.3d at 1089 (quoting *Blakey*, 960 F.2d at 1000–01).

Importantly, Ware did not object to the introduction of any evidence of flight or concealment. Rather, he objected to the flight or concealment jury instruction. "We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012) (quoting *United States v. Felts*, 579 F.3d 1341, 1343 (11th Cir. 2009)).

The District Court did not abuse its discretion in instructing the jury as to flight or concealment. The Government presented evidence that when FBI agents arrested Ware, he was hiding under a bed. At the risk of explaining the obvious, concealment includes hiding. *See Concealment*, Oxford Eng. Dict. (2d ed 1989) (defining concealment as "[t]he action of hiding anything

from view"). Here, we do not have a situation similar to where this Circuit has reversed a conviction due to erroneous flight or concealment instructions.

In *United States v. Myers*, our predecessor Court reversed Myers's federal bank robbery conviction. 550 F.2d 1036, 1039 (5th Cir. 1977).[16] Myers fled from law enforcement on two occasions. *Id.* at 1048. The first time, FBI agents had been trying to contact Myers by phoning his apartment. *Id.* The woman with whom he shared the apartment answered multiple times and informed Myers that agents were looking for him but only to gather information about a different person. *Id.* Later, one of the FBI agents—in plain clothes—ran after Myers in a mall, and Myers took off. *Id.*

The second time, which was two months after the bank robbery in Florida, FBI agents pursued Myers—who was on a motorcycle and in California—in an unmarked car, crossing over the center line and presenting the possibility of a head-on collision. *Id.* at 1048–49. A plain clothes agent then emerged from the car, and Myers and his comrade began moving away from the motorcycle before the agent identified himself and placed them under arrest. *Id.* at 1049.

---

[16] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

Regarding this second flight incident, the Court specifically identified that (1) the fleeing evidence consisted of one FBI agent's testimony, which was inconsistent with regard to this flight event, and (2) Myers had committed a second armed robbery in Pennsylvania between this arrest and the Florida robbery for which he was tried.  *Id*. at 1050.  As for the first flight incident, the Court stated that "[t]he more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense" in reference to the agents chasing Myers in the mall three weeks after the robbery and Myers leaving the state between three and six weeks after the robbery.  *Id*. at 1051.

To sum up its holding, the *Myers* Court set out four inferences that a jury must be able to draw from the defendant's behavior in order for flight (or concealment) to be relevant to a showing of actual guilt:

> [Flight or concealment's] probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id*. at 1049.

Here, the FBI arrested Ware a mere twelve days after the New You Massage robbery. This is not a "significant time delay." *Williams* 541 F.3d at 1089. Further, Ware was likely not hiding due to "several unrelated crimes." *Id.* Though he presents the possibility that he was hiding due to an outstanding parole violation, Appellant Br. at 37, we are not convinced this would mean the District Court abused its discretion. The jury heard evidence that Ware committed several related crimes, and that he searched himself and the robberies on his cellphone. Such evidence also supports the inference that Ware knew about the crimes and that they were, in fact, crimes.

The District Court's instruction also took great pains to explain to the jury that even if the jury finds that Ware hid from the FBI, they need not necessarily find that such behavior evidenced guilt. The District Court's instruction walked the jury through all the inferential steps from concealment to consciousness of guilt, from consciousness of guilt to consciousness of guilt of these specific crimes, and from specific consciousness of guilt to actual guilt. The District Court did not abuse its discretion in so instructing the jury.

The language of the instruction could not possibly have been an abuse of discretion either. For one, the language was taken from our Circuit's pattern jury instructions. Eleventh Circuit Criminal Pattern Jury Instruction S19. While Ware properly objected to the inclusion of the jury instruction, Ware raises for the first time on appeal the suggestion that even if a jury instruc-

tion was not an abuse of discretion, the exclusion of language indicating that the jury had to find each inferential step beyond a reasonable doubt was an abuse of discretion. To begin with, the addition of this language was never suggested to the District Court, thus giving the Court an opportunity to rule on the merits of such an objection, so we can only review this contention for plain error.[17] But again, the District Court used this Circuit's pattern instruction. It could not have plainly erred in this regard.

Additionally, the case Ware cites for the proposition that the reasonable doubt standard must be included in the jury instruction does not alter our conclusion. *See Williams*, 541 F.3d 1087. The holding in *Williams* is that the district court did not abuse its discretion in instructing the jury on flight or concealment, and those instructions happened to include the reasonable doubt language. *Id.* at 1089. As a logical matter, a case that says it was not an abuse of discretion to give a jury instruction that included the reasonable doubt language does not mean that it *would* be an abuse of discretion to give the jury instruction without that language.

---

[17] Under plain error review, the defendant must demonstrate that: (1) an error occurred; (2) the error was plain—clear or obvious; and (3) the error affected the defendant's substantial rights. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1290 (11th Cir. 2003) (quotation marks and citation omitted) (alteration in original).

Last, Ware's brief urges this Court to, in the face of precedent to the contrary, hold that flight instructions are not appropriate as a general matter, as they focus the jury's attention on the alleged flight. Appellant Br. at 38. Not only is this panel bound by this Court's precedential holdings, but we would be remiss if we did not point out the incredibly steep cliff it is to argue that the District Court *abused its discretion* in doing anything that is firmly supported by Circuit precedent.

## V.

Finally, while we normally also review sentences under an abuse of discretion standard, *see Gall v. United States*, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007), we review a district court's factual findings "for clear error, and its application of those facts to justify a sentencing enhancement . . . *de novo*." *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017) (citing *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015)).

"Section 2B3.1(b)(4)(B) 'provides an enhancement for robberies where a victim was . . . physically restrained by being tied, bound, or locked up.'" *United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013) (quoting U.S.S.G. § 2B3.1, cmt. background). The enhancement, however, is not limited to those specific examples; rather, it also applies when the defendant's conduct "ensured the victims' compliance and effectively prevented them from leaving" a location. *Id.* (internal quotation marks omitted) (quoting *United States v. Jones*, 32 F.3d 1512, 1519 (11th Cir. 1994) (per curiam)).

We have found the physical restraint enhancement to apply where a defendant "creates circumstances allowing [his victims] no alternative but compliance." *United States v. Whatley*, 719 F.3d 1206, 1223 (11th Cir. 2013) (internal quotation marks omitted) (quoting *Jones*, 32 F.3d at 1519).

The District Court properly applied the restraint sentencing enhancement here.[18] This Circuit's precedent clearly indicates that when an armed robber uses the threat of deadly force with his firearm to compel a victim to move or to stay in place, the enhancement applies. In *United States v. Victor*, we held that the physical restraint enhancement could apply where a bank robbery defendant pretended to have a firearm in his pocket, directed a bank teller a short distance and "yelled that he had a gun and would kill any bank employee who did not comply with his demands." 719 F.3d at 1289.

In another bank robbery case, this Court affirmed the application of the enhancement where the defendants "forced [bank employees and customers] at gunpoint into the safe room and ordered [them] to lie face down on the floor" as the robbers closed the door and left. *Jones*, 32 F.3d at 1519. This warranted the enhancement despite the lack of physical contact, threats, or locking the safe door because "the obvious presence of handguns ensured

---

[18] Ware only challenges the enhancement as applied to the robberies at Lush Nails & Spa, Royal Massage, and BD Spa. Appellant Br. at 45.

the victims' compliance and effectively prevented them from leaving the room for a brief period." *Id.*

In yet another bank robbery case, this Court declined to adopt a per se bar against applying the abduction enhancement[19] where a defendant moved victims within a singular building. *Whatley*, 719 F.3d at 1222. While the *Whatley* Court remanded for sentencing due to the application of the abduction enhancement, it did find the physical restraint enhancement appropriate where the defendant ordered bank employees to the floor, into a bank's break room, into bank vaults, into a video surveillance room, and into a kitchen area. *Id.* at 1209–11, 1223.

Ware argues that by minimizing the amount of physical contact needed to trigger the restraint enhancement, we risk collapsing the enhancement, making it applicable to every instance of robbery with a firearm. But this is not true. We would have a closer case if Ware had entered these establishments, pointed a gun at the victim behind the welcome counter, demanded, "Your money or your life," obtained money from the victim, and left without further incident. What Ware actually did, however, is not analogous to this hypothetical situation.

At the Lush Nails & Spa robbery, a witness testified that Ware and Smith entered the store, brandished their guns, and told everyone not to move. Ware also pointed a gun in a cus-

---

[19] The abduction enhancement adds four rather than two points to a defendant's sentence calculation. *See* U.S.S.G. § 2B3.1(b)(4)(A).

tomer's face while she was on the floor and threatened to kill her. This constituted restraint as the threat of death and the instruction to not move ensured the victims' compliance.  At the Royal Massage robbery, Smith grabbed an employee with his arm around her neck and pointed his gun at her head, moving her behind the front counter.  Ware also forced a victim to the ground at gunpoint.  This is restraint.  Smith literally restrained an employee by the neck; both Smith and Ware ensured compliance and movement at the point of a gun.  At the BD Spa and Wellness Massage robbery, Ware forced an employee down the hall of the establishment at gunpoint.  This is certainly restraint as well.  Just as Ware tying the victim up and carrying her down the hallway would have constituted restraint, so does him forcing her down the hallway with the point of his gun.

Ware relies heavily on a Third Circuit test under which it is quite probable that the sentencing enhancement would not apply to these three robberies.  *See United States v. Bell*, 947 F.3d 49 (3d Cir. 2020).  *Bell*, which further relies on cases from other circuits, directly conflicts with established Eleventh Circuit precedent.  It goes without saying that Third Circuit precedent cannot supersede contrary Eleventh Circuit precedent in appeals to this Court.

Ware also argues in his brief that the same conduct cannot be used for the bodily injury enhancement and the physical restraint enhancement.  Assuming arguendo that this is true, a witness to the Lush Nails & Spa robbery testified that Ware and Smith told the victims in the store not to move as they brandished

weapons. There were therefore two distinct actions—this initial instruction not to move and the later bodily injury inflicted on the Lush Nails & Spa customer—that could activate a physical restraint enhancement and bodily injury enhancement without any overlap. The District Court therefore did not err in applying the physical restraint enhancement to the Lush Nails & Spa, Royal Massage, and BD Spa robberies.

## VI.

For the foregoing reasons, we hold that the District Court did not abuse its discretion in not holding a formal *Daubert* hearing before allowing the Government's fingerprint expert to testify, in admitting Agent Winn and Agent Costa's lay identification testimony, or in instructing the jury on flight or concealment. We also hold that the District Court did not err in applying the physical restraint sentencing enhancement to the Lush Nails & Spa, Royal Massage, and BD Spa robberies. Ware's convictions and sentence are therefore

**AFFIRMED.**